**FIDELITY BUILDING & LOAN ASS'N v. THOMPSON et al.**

Motion No. 10010; No. 1493-5769.

Commission of Appeals of Texas, Section A.

June 9, 1932.

M. B. Soloman and Paul T. Doss, both of Dallas, for plaintiff in error.

Turner, Rodgers & Winn and Otis Bowyer, Jr., all of Dallas, for defendants in error.

James V. Allred, Atty. Gen., and Everett L. Looney, Asst. Atty. Gen., and Sylvan Lang and Leslie Byrd, both of San Antonio, as amici curiæ.

CRITZ, J.

Our original opinion is found at 45 S.W. (2d) 167, and we refer thereto for a full statement of the nature and result of this case.

In our original opinion we held that section 40 of the Building and Loan Act of 1929 (Acts 41st Leg., 2d Called Sess., c. 61), as amended by the Building and Loan Act of 1930 (Acts 41st Leg., 5th Called Sess., c. 51; Vernon's Ann. Civ. St. art. 881a—39), could not be given effect to impair contracts made prior to its effective date, because to give that statute such a construction would render it unconstitutional as in contravention of section 16 of article 1 of the Texas Constitution and section 10, article 1, of the Federal Constitution.

In its motion for rehearing the Fidelity Building & Loan Association, plaintiff in error, urgently insists that the above holding is erroneous and that under section 17 of article 1 of the Texas Constitution and article 1318, R. C. S. of Texas 1925, the Legislature had the right to enact the above-mentioned building and loan statute and apply its provisions to contracts already in existence when such act became effective.

Section 40, supra, of the 1930 Building and Loan Act (Vernon's Ann. Civ. St. art. 881a—39), reads as follows: "Any loan made by a building and loan association may be repaid at any time after three months have elapsed from the time of making such loan, provided the borrower shall pay the principal due thereon (less the withdrawal value of the shares transferred as security therefor), loan expenses, the premium due and the interest accrued at the time of such repayment, and all sums advanced by the association for taxes assessments or insurance premiums, with interest thereon; and in addition thereto interest on the principal repaid for the period of three months after the date of repayment. Any borrower desiring to retain the shares may repay his loan without claiming credit for the withdrawal value of such shares, whereupon such shares shall be retransferred to the borrower and shall be free from any claim by reason of said loan. If any such association is in process of either voluntary or involuntary liquidation, the payments made by such borrower, plus credited dividends, less any lawful fees, fines, penalties or advances owing by such member on his shares of stock, shall be applied on the indebtedness owing by such borrower, who shall have the same time for payment at the same rate of interest as would

have been required if said association were not in liquidation."

Section 17, art. 1, of our State Constitution reads as follows: "No irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the legislature, or created under its authority, shall be subject to the control thereof."

Article 1318, R. C. S. 1925, reads as follows: "All charters or amendments to charters, under the provisions of this chapter, shall be subject to the power of the Legislature to alter, reform or amend the same."

As shown by our original opinion, both associations here involved were incorporated under the building and loan association statutes of this state as they existed prior to the enactment of section 40, supra, as contained in both the 1929 and 1930 acts. In fact, both the 1929 and 1930 acts here attempted to be applied became effective after these associations became insolvent and after this case was finally tried and disposed of by the district court. The 1930 act became effective after this case was decided by the Court of Civil Appeals.

We have demonstrated in our original opinion that under the law as it existed prior to 1929, the rights and liabilities of all shareholders as such, both borrowing and nonborrowing, were equal, and in case the association suffered losses the stock of the borrowing shareholder shared in such losses just the same as the nonborrowing shareholder. It is contended by the association that under the 1930 act, supra, all this is changed, and under such act, where any association is in either voluntary or involuntary liquidation the borrowing shareholder is entitled to full credit for all payments on stock made by him, plus credited dividends, less lawful fees, etc. In other words, it is contended that the 1930 act relieves the borrowing shareholder of any losses on his stock when the association is in liquidation, and places all such losses on the nonborrowing shareholder, and can be applied to contracts entered into before the act became effective, and that such act so construed can be applied in this case where the association was insolvent and in process of liquidation in the district court under final judgment, when the act became effective.

■ In connection with the above it is further contended that the right to so apply the 1930 statute so construed to contracts made before its effectiveness exists by reason of the provisions of section 17 of article 1 of our State Constitution and article 1318, R. C. S., supra. In other words, it is contended that since the statute, article 1318, has reserved the power in the state to "alter, reform or amend" charters, the state has the right to enact a law, the effect of which is to impair or even destroy the value of the nonborrowing

shareholder's stock, while that of the borrowing shareholder is left to consume all of the property of the association, if it is necessary to do so, to give full credit for money paid therefor, plus credited dividends, less lawful fees, etc., and that even though at the time the nonborrowing shareholder made his contract he stood equal with the borrowing shareholder. We think to merely state the contention is to refute it. 7 R. C. L. p. 125, § 96; Union Pacific R. R. Co. v. United States, 99 U. S. 700, 718, 25 L. Ed. 496; Greenwood v. Union Freight Co., 105 U. S. 13, 17, 26 L. Ed. 961; Love v. City of Dallas (Tex. Sup.) 40 S.W.(2d) 20. These authorities might be multiplied many times, but we consider them sufficient.

■ It is certainly the settled law of this state that article 1318, supra, will be given full force and effect in regard to all matters that it has application to; but it certainly has no application whatever to authorize the Legislature to destroy or impair personal or real property rights acquired by the corporation during its lawful existence. Furthermore, property rights, together with contract rights and choses in action, which do not in their nature depend on the general powers conferred by the charter, cannot be destroyed or impaired by the repeal or amendment of the charter. The reserved right in the state to "alter, reform or amend" charters does not give the state the right to destroy or impair the rights of shareholders to their interest in the property of the corporation. If the state can destroy or impair the property rights of nonborrowing shareholders in the instant case by requiring them to suffer all losses when their position was equal with borrowing shareholders under the contract by which they became shareholders, then the state in any instance, and as to any corporation, can impair and destroy the rights of shareholders in the property thereof by legislation enacted after the contract is made.

In connection with the above, we wish to adopt and approve the rule as laid down in 7 R. C. L. p. 125, supra. It is as follows: "Though the constitution of a state declares that the legislature has power to alter, revoke or amend any charter of incorporation, the property which corporations acquire in the exercise of the capacities conferred on them they hold subject to the same guaranties which protect the property of individuals from spoliation. Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not, in their nature, depend on the general powers conferred by the charter, cannot be destroyed or taken away by the repeal or amendment of the charter, and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of

such a corporation, to their interest in its property, are not annihilated by a repeal or alteration and there must remain in the courts the power to protect those rights. Nor does it give to the legislature the power to destroy or impair the contracts of third persons with such corporations; no executed contract made by the corporation with a third person, or with individual members of the corporation, could be impaired by any alteration of the charter power. But this is quite different from the power to alter or change or repeal the powers themselves so that no such rights could thereafter be acquired and such contract thereafter be made. And where a state has reserved the power by general statute to change, modify, or destroy any corporation at will, such right is not abridged or in any manner affected by executory contracts entered into by a corporation with third persons, or by such persons with their subcontractors, before an act amending such corporation's charter was passed. All parties are bound to take notice of the general law of the state under which the power exercised was reserved. If such contracts cannot be performed consistently with the alteration in the charter made by the amending statute, their performance, in so far as thus hindered or obstructed, will be excused, under the rule that performance of contracts rendered impossible by act of law is excused. And so the fact that a repealing statute destroys the right of a corporation to continue in existence under the statute repealed does not make such repealing statute unconstitutional even as against bondholders of the corporation. The execution of the mortgage and the issuing of bonds secured by the property of the corporation do not affect the right of the legislature to repeal the statute."

In Union Pacific R. R. Co. v. United States, supra, the Supreme Court of the United States had before it for decision the power of the lawmaking body to alter charter rights in a case wherein the act of Congress creating such rights contained the power to "alter, amend and repeal this Act." In passing on the things and powers reserved, the court, speaking through Chief Justice Waite, said:

"The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable. * * *

"Taking both acts together, and giving the explanatory statement in that of 1862 all the effect it can be entitled to, we are of the opinion that Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power. That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made; but, as was said by this court, through Mr. Justice Clifford, in Miller v. State [of New York (15 Wall. 498), 21 L. Ed. 104], 'it may safely be affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of stockholders and of creditors, and for the proper disposition of its assets;' and again, in Holyoke Company v. Lyman (15 Wall. 519 [21 L. Ed. 139]), 'to protect the rights of the public and of the corporators, or to promote the due administration of the affairs of the corporation.' Mr. Justice Field, also speaking for the court, was even more explicit when, in Tomlinson v. Jessup (15 Wall. 459 [21 L. Ed. 206]), he said, 'the reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges and immunities derived by its charter directly from the State;' and again, as late as [Maine C.] R. R. Co. v. Maine (96 U. S. 510 [24 L. Ed. 840]), 'by the reservation * * * the State retained the power to alter it (the charter) in all particulars constituting the grant to the new company, formed under it, of corporate rights, privileges, and immunities.' Mr. Justice Swayne, in Shields v. Ohio (95 U. S. 324 [24 L. Ed. 359]), says, by way of limitation, 'The alterations must be reasonable; they must be made in good faith, and be consistent with the object and scope of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration.' The rules as here laid down are fully sustained by authority. Further citations are unnecessary.

"Giving full effect to the principles which

have thus been authoritatively stated, we think it safe to say, that whatever rules Congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into. It might originally have prohibited the borrowing of money on mortgage, or it might have said that no bonded debt should be created without ample provision by sinking-fund to meet it at maturity. Not having done so at first, it cannot now by direct legislation vacate mortgages already made under the powers originally granted, nor release debts already contracted. A prohibition now against contracting debts will not avoid debts already incurred. An amendment making it unlawful to issue bonds payable at a distant day, without at the same time establishing a fund for their ultimate redemption, will not invalidate a bond already out. All such legislation will be confined in its operation to the future."

In Greenwood v. Union Freight Co., supra, the United States Supreme Court had before it a case involving the change of a charter granted by the state of Massachusetts. The state had in force when the charter was granted a statute which provided: "Every act of incorporation passed after the eleventh day of March in the year one thousand eight hundred and thirty-one, shall be subject to amendment, alteration, or repeal." (Gen. St. 1860, c. 68, § 41). In passing on the rights of the state to amend, alter, and repeal charters under the powers reserved by the above act, the court, speaking through Justice Miller, said:

"It would be difficult to supply language more comprehensive or expressive than this.

"Such an act may be amended; that is, it may be changed by additions to its terms or by qualifications of the same. It may be altered by the same power, and it may be repealed. What is it may be repealed? It is the act of incorporation. It is this organic law on which the corporate existence of the company depends which may be repealed, so that it shall cease to be a law; or the legislature may adopt the milder course of amending the law in matters which need amendment, or altering it when it needs substantial change. All this may be done at the pleasure of the legislature. That body need give no reason for its action in the matter. The validity of such action does not depend on the necessity for it, or on the soundness of the reasons which prompted it.

This expression, 'the pleasure of the legislature,' is significant, and is not found in many of the similar statutes in other States. * * *

"Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not, in their nature, depend upon the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. *The rights of the shareholders of such a corporation, to their interest in its property, are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights.*" (Italics ours.)

In Love v. City of Dallas, the Supreme Court of Texas, speaking through Chief Justice Cureton, went into an exhaustive discussion of the vested and property rights of incorporated school districts and held that the Legislature has the right and power, at its discretion, to abolish such districts, or enlarge or diminish their boundaries, or increase, modify, or abrogate their powers, but that it does not have the right or power to divest the property and funds of such districts from the purposes to which they have been dedicated. In other words, in the Love Case it was clearly held that the right which exists in the Legislature to alter and abolish school districts, or to alter, increase, diminish, and abrogate their powers, does not clothe the Legislature with power to destroy or confiscate the real beneficial ownership of their properties.

We think enough has been said to demonstrate that the powers reserved by article 1318, supra, to "alter, reform or amend" corporate charters, do not give the Legislature the right to impair or destroy the previously vested rights of shareholders to their proportionate interest in the property of such corporations.

In this connection we wish to say that we do not hold that section 40 of the 1930 act, supra, was intended to apply to contracts made before its effectiveness. We do hold, however, as above stated, that it cannot be applied so as to destroy or impair the rights of nonborrowing shareholders who became such prior to its effective date.

■■ It seems to be contended that articles 859, 860, R. C. S. 1925, in force at the time the contracts here involved were entered into, are authority for charging all losses in this case to the nonborrowing shareholders. When these articles are construed together, it is clear that they have no application to prefer the stock of a borrowing shareholder over that of a nonborrower. This is evident because article 859 plainly provides

that the borrower "shall be given credit for the withdrawal value of his shares pledged as security." This provision is followed immediately by article 860, which attempts to define "withdrawal value." The term is then defined as "the then value of the stock at the time indicated in the connection in which the words are used, less the lawful charges against such shares in favor of the corporation." If the Legislature had intended for the borrowing shareholder's stock to be charged with no losses of the association, it certainly would have said so in unmistakable language. Instead of that, it provided that he should be given credit for the "withdrawal value." The withdrawal value certainly meant the actual or real value. Also it is clear that article 859, supra, only has application to going concerns, and has no application whatever to insolvent associations in liquidation. This is evident because of the very nature of such institutions and the complications involved in liquidating them when insolvent.

In an amici curiæ brief filed by counsel other than counsel directly connected with the suit, it is urged that there are many associations in this state who have outstanding contracts, which, by their own terms, give borrowing shareholders full credit on their indebtedness to the association for all payments made on their stock, together with in-terest, etc., and that the effect of our original opinion is to invalidate such contracts. This contention is unjustified. Our original opinion simply decides the case before us, and that case involves nothing but the right of the Legislature to by statute impair a contract made before the act became effective. It is not even contended in the instant case that the contracts here involved contain any provision within themselves which remove them from under the law.

Finally, it is contended by the association that the holding of this Section of the Commission in the case of Jefferson County Title Guaranty Co. v. Tarver, 119 Tex. 410, 29 S. W.(2d) 316, adopted by the Supreme Court, is authority for holding that under article 1318, supra, the Legislature can enact a statute impairing the contracts here involved. We think the holding in that case is authority for no such proposition. The Tarver Case involved a statute which was purely regulatory in its nature, and which did not attempt to destroy or impair any vested property right, or the rights of stockholders. We think a reading of that opinion will fully demonstrate that it has no application whatever to sustain the contentions made by the association in the instant case.

We recommend that the motion for rehearing filed herein by plaintiff in error be in all things overruled.