# Richmond

CRADDOCK-TERRY COMPANY, ET ALS. V. W. D. POWELL, AND OTHERS.

October 12, 1942.

Record No. 2513.

Present, All the Justices.

The opinion states the case.

*Kemp, Hobbs & Davidson,* for the appellants.

*Meade & Talbott,* for the appellees.

BROWNING, J., delivered the opinion of the court.

Craddock-Terry Company received its charter from the corporation court of the city of Lynchburg, Virginia, in the year 1898. Thereafter there were several amendments to it, the first, in 1901, by the court which had issued it. The amendment designated in the record as "No. 1" was had in January, 1913. That designated as "No. 2" was in November, 1917. The two last mentioned, provided for the issuance by the corporation, of its stock structure of that time. These two amendments were granted by the State Corporation Commission. The old company, as we shall hereafter refer to it, issued four classes of stock, namely: First Preferred, Second Preferred, Class C. Preferred, and Common, all of the par value of $100.00.

The company appears to have been successful in its operations from the beginning until the year 1929, when it suffered from the severity of the depression. It was so strong that it weathered the storm but it was left in serious financial stress. Its volume of business had become greatly reduced. Its capital stock had become impaired to the extent of nearly two million dollars. When that unhappy period in the industrial and commercial life of the nation came, this company was the pride of Lynchburg and, indeed, of the state of Virginia, and it was the product largely of the financial acumen and business genius of the late lamented John W.

Craddock of that city. At the time of the beginning of the things which led up to this litigation, it was shaky and unstable. Its board of directors was confronted with the perplexing problem of finding some way to infuse new life into it and effect, if possible, its restoration. To this end the board, aided by its special committee, devised a plan for forming a new corporation to carry on. The old company was to sell all of its assets (except its franchise) to the new corporation, which would issue the same number of shares as the old company had had, divided into the same classes, the par value of each share to be $100.00, except the common shares, which were to have no par value. In return for the shares in the old company each stockholder was to receive a like number of shares of the corresponding class of stock in the new company. In addition to this, each preferred stockholder in the old company was to receive a certain number of shares of common stock in the new company. It may be well to say that no cash money was to pass in this transaction so far as the stockholders were concerned. Neither was the new company to pay to the old company any money. The consideration to the old company for its assets was to be stock in the new company and the assumption of its debts and liabilities.

On August 1, 1938, the president of the old company sent a letter to all of its stockholders setting forth the terms of the proposed sale and exchange of stock. The deal was to be consummated upon the written consent of at least 80% of the several classes of stockholders, signified on or before February 1, 1939. By November 14, 1938, more than 80% assented and the transaction was consummated on January 23, 1939, and this was reported to and ratified by a meeting of the stockholders on January 28, 1939.

[■] Just here, we may say that this last date, in our opinion, was the time of the effectuation of the scheme and thus the time from which the dissident shareholders had the statutory period of three months within which to give notice to the old company of their dissent. This disposes of the contention that they failed to comply with the requirement

of the statute as to notice of their opposition to the plan. Further, we are not impressed with the contention that the appellees knew all along about the proposed plan and its details and that their silence and their alleged conduct constituted acquiescence in the thing which made them subject to the successful interposition of the defense of estoppel. We think that the contention lacks determinative merit.

But the appellees are open to the charge of having taken, in the successive steps of pleadings filed, inconsistent positions. First, they asked for the fair cash value of their holdings, as though they were quite familiar with the provisions of the statute, which the appellants invoke, and at that time deemed them applicable. Next, they asked for the sum of $110.00 a share plus accumulated dividends, and finally they demanded, by an election, the par value of their shares, together with such interest as the court might deem proper. The latter is their present attitude which won the sanction of the trial court. We do not think these variant positions of contest have the fatal effect which the appellants urge, for the reason that they were taken by amendments to the original complaints, or pleadings, in the nature of substitutions, which were not insistently challenged, and because the appellants were not hurt by them. They did not in any wise change their lines of legal defense because of them. They stoutly maintained all the while that they had proceeded under the appropriate statutes, which was the only way they could proceed, and that the dissatisfied shareholders were bound by their terms. Thus with the rapier thrusts out of the way, we come to the controlling issue.

The portion of the statute with which we are principally concerned is as follows:

"     *     *     *     *     *     *     *

"The rights of any stockholder of the vendor corporation, whether or not the said stock so held by him has voting power, who shall not have given his assent to such sale, conveyance or transfer, and who shall be dissatisfied therewith, shall be the same *mutatis mutandis* as that of a

stockholder of a consolidated or merged corporation, who shall not have given his consent to such consolidation or merger and who shall be dissatisfied therewith, and the same procedure *mutatis mutandis* to ascertain the fair cash value of his stock shall be had, as now or may be hereafter provided by statute in case of such stockholder of a merged or consolidated corporation and/or as now exists under the general law; provided, however, that the value so ascertained shall be paid to such stockholder by the vendor corporation and the purchaser from the vendor corporation shall in no wise be liable to such stockholder for the value of his stock, but nothing herein contained shall deprive any stockholder of existing remedies at law or in equity in the event of fraud or inadequacy of consideration." Section 3820a, Code of Virginia.

The statute quoted from is sometimes called the "Sales Statute." It provides for just what was done in this case and the plan is an embodiment of its provisions. At the end of the first paragraph is this significant provision: "and provided, further, that any such sale or lease under the provisions of this section shall not affect (effect) a dissolution of the vendor corporation." The parenthetical word is employed by us as correcting what is a patent typographical error.

The appellees barricade themselves behind the provisions of the charter amendment of January, 1913, and similar language incorporated in their stock certificates. Paragraph (b) is as follows: "All preferred stock issued under authority of this resolution shall be preferred as to earnings to the extent of six per cent per annum, and said dividends shall be cumulative, and said preferred stock shall also be preferred as to assets in liquidation."

This is urged as their authority for the last position taken, that is that the plan proposed by the board of directors and adopted by more than 80% of the stockholders was really a *liquidation* of the assets of the old company.

The judge of the trial court filed as a part of the record an opinion which clearly and ably sets forth his conclusions

and his reasons therefor. His opinions are always lucid and interesting. He adopted the view of the appellees, holding that the plan of sale contemplated distribution and liquidation of all of Craddock-Terry Company's assets, and from a practical standpoint it resulted in a dissolution of the corporation. He said, among other things, "The Virginia statutes as I read them do not deal with distribution in liquidation. Certainly not in terms. And if it could be fairly said that they did, the result would not be changed, because I would have no hesitancy in saying that any such attempted impairment of the contract obligations of the holders of the several classes of stock would be unconstitutional."

We do not regard these declarations as sound expositions of the law. They make the statutes, sections 3820a and 3822, under which the plan was conceived and formulated, of no effect in this case and they are in the face of the decision of this court in the case of *Winfree* v. *Riverside Cotton Mills*, 113 Va. 717, 75 S. E. 309. It is true that that case had to do with the consolidation of two or more corporations, but it dealt with the rights of dissenting stockholders and much of what was said there is as applicable to the conditions that obtain here.

In speaking of the reservation of the power to the state to alter and amend the charter of a corporation this court, in that case said:

"It seems that such a reservation of power to the state prescribed by the laws in force when the charter is granted, whether written in the constitution, in general laws, or in the charter itself, qualifies the grant, and the *subsequent exercise of that power cannot be regarded as an act impairing the obligation of contracts.*" (Italics ours.)

Let us turn aside for the moment and consider the meaning of the word "liquidation" as it appears in the preferred stock certificates and in the amendments to the charter, which have been heretofore quoted. The appellees lean strongly upon the defense that the plan, which we have been considering and which was adopted in the reorganiza-

tion of the old company resulting in the new company was really and in fact a liquidation of the assets of the old company, and this contention was sustained by the trial court. The scheme or plan and its incidents do not sustain this position.

In Words and Phrases, Judicially Defined, vol. 5, page 4180, we find the following:

"Mr. Justice Story said in *Fleckner* v. *Bank of United States*, 21 U. S. (8 Wheat.) 338, 362, 5 L. ed. 631, 'The ordinary sense of liquidation, as given by lexicographers is to clear away—to lessen—a debt; and in common parlance, especially among merchants, to liquidate the balance is to pay it.' *Richmond* v. *Irons*, 7 Sup. Ct. 788, 804, 121 U. S. 27, 30 L. Ed. 864.

" 'In its general sense, liquidation means the act or operation of winding up the affairs of a firm or company by getting in the assets, and appropriating the amount of profit or loss.' 3 Cent. Dict. 3474. 'The word was so used in a resolution of the directors of an insurance company to reinsure its risks and to liquidate its affairs.' *L. D. Garrett Co.* v. *Morton*, 71 N. Y. Supp. 17, 19, 35 Misc. Rep. 10."

" * * * Liquidation is the act of settling or adjusting debts, or ascertaining their amount, or the balance due." Am. & Eng. Ency. of Law, Second Ed., vol. 19, page 391.

The plan submitted by the board of directors, measured by the above definitions, dissipates the notion of the presence of liquidation. It was not concerned with the debts of the old corporation, as to a statement of them for the purpose of paying any balance ascertained. It was not an operation of winding up the affairs of the old company by getting in its assets and settling with its debtors and creditors, nor did the element of "profit or loss" enter into it. In our opinion it involved an entirely different and exceedingly important doctrine associated and connected with corporations, which is that of Reorganization.

In Corpus Juris Secundum, vol. 19, page 1318, section 1578, an entire section (that referred to) is devoted to the subject "Reorganization". This is said: "Reorganization of

a corporation is the reconstruction or rehabilitation of an existing corporation. It is frequently regulated by statute, the right to reorganize being derived from the laws of the state of the corporation's origin.

"Reorganization, in the law of corporations, has been defined to mean that by some process a corporation has organized anew, usually effected by the dissolution of one and the organization of a new corporation to take the property and franchise of the first and to continue its business. * * * * It has been held that where a new corporation is formed by stockholders and directors of an existing corporation, and its directors and practically all the stockholders, franchises, and property are identical with those of the old corporation, the transaction both in fact and in law amounts to a reorganization of the old corporation."

Idem. "While courts will not formulate plans of reorganization and compel the persons affected thereby to accept them against their will, yet courts in general are favorable to reorganizations which are fair and free from fraud."

By the plan which was adopted the new corporation, i. e., the Craddock-Terry Shoe Corporation, was formed by stockholders and directors of the old corporation, i. e., Craddock-Terry Company. The stockholders and directors of the new corporation and its property (except its franchise) are identical with those of the old corporation, with the exception of the dissident stockholders of the old company. Their objects, purposes and business were identical with the exception of the fact that the new corporation entered the business world with a capital structure unimpaired and in inviting form for credit and confidence. This was accomplished by the single stroke of reducing the par value of $100.00 for the existing common stock to new common of no par value, but which is carried on the books of the new corporation at $1.00 per share. This advantageous condition is in contrast to that of the old company which was burdened with a capital impairment of approximately two million dollars.

The new set-up should have presented a consummation devoutly to be wished.

We digress a bit to comment upon the contention in the appellees' brief that the plan was an effort to enhance the value of the common stock which is largely held, it is said, by members of the board of directors, and to the detriment and injury of the preferred stockholders. It does not appear to work out precisely that way. The preferred stockholders not only get the same number of shares in a new, virile, going company, but they get a bonus of common stock in the new company. In the old company the common stock was not worth anything if the merciless assaults of the dissident stockholders prevailed. It is not worth anything in the new company unless its parent is abundantly successful. Its prospects are *in futuro*, but happily for the situation we are enabled to say, from the record, the new company has started upon what appears to be an auspicious career. This has been achieved by a board of directors which, we think the record justifies us in saying, has been ever on the alert to care for the interests of the company and all of its shareholders and its creditors. The new company assumed the debts and liabilities of its predecessor, the old one. The directors adopted a wise and benign policy, as might have been expected of men of financial experience and ability. Their course has been justified by subsequent events.

In *Winfree* v. *Riverside Cotton Mills*, 113 Va. 717, 75 S. E. 309, *supra*, regarding the effect of section 158 of the Virginia Constitution relating to corporations, it is said that a corporation, after accepting or effecting an amendment to its charter, holds its charter and franchises, and all amendments thereof, under the provisions and subject to all the requirements, terms, and conditions of the Constitution, and any laws passed in pursuance thereof, so far as the same might be applicable to such corporation.

And this court then says in that case:

"That this is the construction which should be placed upon the language used is shown by the construction

which has generally, if not universally, been placed upon the language reserving the power to the state to amend, alter or repeal a charter. Although the power reserved is to alter, amend, or repeal the charter, it is not limited to changes or alterations solely between the state and the corporation, but authorizes amendments and alterations, within certain limitations, directly affecting the stockholders in their relations to the state, to the corporation, and to each other."

So then when the preferred stock was acquired the purchasers took it with notice of all the provisions of law affecting it and the corporation which issued it. The appellees were affected with notice of the provisions of sections 3820a and 3822 of the Code of Virginia. These provisions were as much a part of their contract as though they had been written into the stock certificate, itself. And, as we have seen from the authorities cited, including those of Virginia and West Virginia, the exercise of the powers granted by law cannot be regarded as an act impairing the obligation of contracts or as an act taking away vested property rights. That this is so must be true, else what would become of distressed corporations in many instances? The board of directors, a body of men chosen for their honesty of purpose, business acumen and broad vision, is charged with the management of their company. Too frequently it is a hard and thankless task. If the corporation is successful they win laudation, if misfortune overtakes it they receive condemnation. If they were not afforded reasonable latitude in the selection of a remedy for their stricken patient, the resultant evils would be disastrous. None could be more potentially so than an obdurate, dissident shareholder.

This disposes of another contention strongly relied upon, and which is here almost a fetish.

As we have seen, the appellants stand squarely upon the provisions of the two statutes which they meticulously followed. We have not been shown that there was any other course open to them to accomplish the purpose

they had in mind. We believe that the sections relied upon constituted the exclusive method to be followed. The fair cash value of the dissidents' stock as of the day before the adoption of the scheme or plan is what they are entitled to. Although this is strictly a statutory proceeding we believe it satisfies probity and good conscience.

Inasmuch as the Craddock-Terry Shoe Corporation has obligated itself, through its officers, which appears on the record, to pay the fair cash value to the dissident stockholders for the stock held by them, we give judgment in their favor against both companies for the fair cash value of the preferred stock held by them, as of the day before the adoption of the plan complained of. We reverse the decree of the trial court and remand the case for the purpose of ascertaining the true amount of such fair cash value and for the entry of the proper decree or decrees to effect this decision, such decree or decrees to be in conformity herewith.

*Reversed and remanded.*

Hudgins, J., dissenting.

The capital structure of the Craddock-Terry Company, as of November 26, 1938, was as follows:

|  | Shares | Rate | Par | Total |
|---|---|---|---|---|
| 1st Preferred | 12,500 | 6% | $100.00 | $1,250,000.00 |
| 2nd Preferred | 12,500 | 6% | 100.00 | 1,250,000.00 |
| Class "C" | 9,956 | 7% | 100.00 | 995,600.00 |
| Common | 32,514 | 0 | 100.00 | 3,270,400.00 |

|  |  |
|---|---|
|  | $6,766,000.00 |
| Less: Deficit November 26, 1938 | 1,819,795.87 |
| Book Value | $4,946,204.13 |

The assets were valued at $5,191,616.17, which included $238,682.60 in cash on hand and in the banks. The current liabilities were only $194,317.67, which did not include $51,-

094.37 in cash reserved for contingencies. The business for the year ending November 26, 1938, showed net earnings of $62,556.81, less income taxes.

This table of assets and liabilities reveals that no creditor is interested in this litigation. The rights of the holders of the shares of stock were fixed by the charter and the stock certificates. The pertinent provisions of the charter and the certificates of stock were as follows:

"(b) All Preferred stock issued under authority of this resolution shall be preferred as to earnings to the extent of six per cent per annum, and said dividends shall be cumulative, and said Preferred stock *shall also be preferred as to assets in liquidation.*"

"(e) No encumbrance of any character shall be placed by the Board of Directors or stockholders, in shape of mortgage, lien or otherwise upon the property of the Company, unless the same shall provide first for the retirement of the Preferred stock with accumulated dividends upon the terms and conditions as set forth above." (Italics supplied.)

Except for the preference given the first preferred over the second preferred stock, with some minor differences, the preference provisions of the other two classes of preferred stock are substantially the same.

In *Powell* v. *Craddock-Terry Co.*, 175 Va. 146, 7 S. E. (2d) 143, we construed the first sentence in paragraph (b) above to mean that the holders of preferred stock were entitled to a cumulative six per cent per annum dividend out of earnings. In so holding, we stated: "We have been pointed to no decision nor have we been able to find any in which accumulated and unpaid dividends were allowed to a preferred stockholder in the distribution of a corporation's assets *unless such preference was clearly and expressly set forth in the charter.*" (Italics supplied.)

There were no earnings at the time of the decision, February, 1940, out of which any dividends might have been declared. Indeed, as stated in the majority opinion, the capital had become impaired to the extent of $1,819,795.87.

Those who acquired the first preferred stock in the

corporation did so upon the express written guarantee that their rights were superior to those who held the other three classes of stock and that the corporation could not create a mortgage on the assets, whether real or personal, without first buying the preferred stock and accumulated dividends. This the corporation was not financially able to do.

The value of the assets, after payment of corporate debts, was not equal to the par value of the outstanding four classes of stock. The value of these assets was more than equal to the par value of the first, second and third (class "C") classes of stock. Under the corporate structure, the deficit would reduce the value of the common stock by the amount of the deficit. The accumulated dividends would inure to the benefit of the holders of the three classes of preferred stock in the order of stated priorities. Therefore it was apparent that the holders of the common stock would receive no dividends for a number of years.

Confronted with this situation, the directors decided to amend the charter. The proposed amendment reduced the rate of interest on accumulated dividends and permitted the corporation to create liens upon any of its assets without being forced to buy the preferred stock. The Corporation Commission refused to allow this amendment to the charter because it would seriously impair vested rights of the holders of the preferred stock.

It was after the Corporation Commission refused to permit the charter to be so amended that three or more of the stockholders and directors conceived the scheme of forming a new corporation for the purpose of buying all the assets, including the good will, of the old corporation and paying the stockholders of the old corporation with stock in the new corporation. This offer of purchase was accepted by more than eighty per cent of the stockholders in the old corporation and the transfer of good will and all assets was consummated. The provisions of the charter of the new corporation are substantially the same as those set forth in the proposed amendment to the old charter.

The appellees, a minority of the holders of the different classes of preferred stock in the old corporation, decided to assert their rights in the assets of the old corporation, for which purpose they instituted this suit in equity. I repeat, this is not a controversy between the creditors of a corporation and the stockholders, but it is a controversy between the holders of the preferred stock and the holders of the common stock in the same corporation. The respective rights of the parties are set forth in the provisions of the charter and in the certificates of stock. Each of these expressly states that the "preferred stock shall also be preferred as to assets in liquidation."

The majority opinion holds that a sale and transfer of all the assets of the old corporation and a distribution of the purchase price is not a liquidation, yet the opinion, with approval, quotes *Garrett Co.* v. *Morton*, 35 Misc. Rep. 10, 71 N. Y. S. 17, to the effect that liquidation is "the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit and loss."

The debts of the old corporation have been paid. All assets of the corporation have been transferred to another person. The proceeds received from the sale of these assets, in the form of new stock, have been distributed to the stockholders who consented to the sale. The old corporation has no assets or property of any description with which to conduct any business. Whatever profit or loss there may be is included in the value of the stock in the new corporation distributed to the old stockholders, or in such assets as should have been reserved for the benefit of dissenters. These facts, it seems, should be convincing evidence of "liquidation."

If this conclusion is not correct, then the statute permits common stockholders in any solvent corporation, under the guise of "reorganization," to destroy the rights of preferred stockholders, regardless of provisions in the charter and in the certificates of stock. If the Corporation Commission was right in refusing to permit the charter of the old

corporation to be amended because such amendment would impair vested rights of preferred stockholders, then it is not permissible for the same stockholders to accomplish the same results indirectly under the guise of reorganization. It is a matter of little moment to the preferred stockholders whether their rights are impaired by an amendment to the old charter or by the formation of a new corporation by the same parties who acquired the common stock with full knowledge that their rights as stockholders were subservient to the rights of the holders of other classes of stock.

The sale of this preferred stock was a contract, and that contract cannot be changed directly or indirectly. Section 10, Article 1, of the Federal Constitution. This was held in the *Dartmouth College case.* We look to the substance and not to the shadow of things. A contractual right cannot be abrogated by statute or even by a State constitutional provision.

The majority opinion indulges in prophecies as to the virility and future values of the preferred and common stock in the new corporation. In the same opinion the appellees are reprimanded for their refusal to surrender a vested right in exchange for a mere hope that the same directors, in their management of the identical assets in a new corporation, will increase the profits. I do not think that the fact that a minority stockholder, who seeks the aid of a court of equity in order to enforce his rights, is thereby making "a merciless assault" upon the corporation or the other stockholders. Pertinent legal principles should be applied, whether the litigant makes a good or a bad bargain. It is not the function of a judge to praise or condemn litigants who merely exercise the right to choose one of two courses in a business transaction.

For the reasons stated, I think the decree of the trial court should be affirmed.

HOLT and SPRATLEY, JJ., concur in this dissent.