# Richmond

CRADDOCK-TERRY COMPANY, ET ALS. V. W. D. POWELL, AND OTHERS.

April 26, 1943.

Record No. 2513.

Present, All the Justices.

The opinion states the case.

*Kemp, Hobbs & Davidson* and *Tazewell Taylor,* for the appellants.

*Meade & Talbott,* for the appellees.

*George D. Gibson* and *Hunton, Williams, Anderson, Gay & Moore,* amici curiae.

Hudgins, J., delivered the opinion of the court.

The facts are stated in the original opinions, delivered October 12, 1942, *Craddock-Terry Co.* v. *Powell,* 180 Va. 242, 22 S. E. (2d) 30. However, a more chronological and detailed statement is deemed advisable.

The Craddock-Terry Company was chartered by an order of the Corporation Court of the city of Lynchburg on the

12th day of November, 1898. On December 17, 1901, the Corporation Court granted the company an amendment to its charter. The charter and this amendment authorized the company to issue stock, all of the same class, not in excess of $500,000. Pursuant to a constitutional mandate (sec. 154), the General Assembly passed an act entitled "An Act Concerning Corporations" (Acts 1902-3-4, p. 437; Code 1919, ch. 147, sec. 3776), which became effective on May 21, 1903. By this act the Corporation Commission was given exclusive authority to issue and amend charters of all corporations. After May 21, 1903, the Craddock-Terry Company applied to the Corporation Commission for and obtained several amendments to its charter. The last amendment was approved by the Corporation Commission on April 26, 1921. Under the charter as amended, the company was authorized to increase its capital stock to $10,-000,000 and to issue preferred stock of three classes, as well as common stock, all shares to be of the par value of $100 each. The number of shares of the four classes of stock which were outstanding at the time this controversy arose were:

First Preferred ................... 12,500
Second Preferred................. 12,500
Class C Preferred................  9,956
Common .......................... 32,514

The first preferred stock was entitled to cumulative preferential dividends of six per cent. per annum and to "be preferred as to assets in liquidation." It had certain participating rights in the event dividends on the common stock should exceed $12 per share in any year. After six months' default in dividends and until all arrears should be paid, this class of stock was entitled to one vote per share on all matters of corporate interest. In addition, it was entitled to the benefit of two protective covenants: (a) That no lien should be placed on the properties of the

company without providing first for the retirement of the first preferred stock with accumulated dividends; and (b) that no dividends should be paid on the common stock unless capital and surplus should be at least double "the amount of outstanding preferred."

The second preferred stock, subject to the prior rights of the first preferred, had substantially the same characteristics, including the two protective covenants. The restriction as to the dividends on the common stock expressly required the capital and surplus to be "double the amount of the outstanding Preferred stock of all issues before any dividend can be paid on the Common stock."

The class C preferred stock was subject to the prior rights of the first and second preferred. It had substantially the same characteristics, including the two protective covenants. The only difference between class C and the other two preferred classes was that Class C was entitled to a seven per cent. dividend rate and a sinking fund was provided for the retirement of all of class C preferred stock. The liquidation preference of all three classes of preferred stock was clearly stated to be "preferred as to assets to the extent of the par value thereof, but no further, in the case of the liquidation of the company."

The company failed to pay dividends in 1930 and no dividends were paid thereafter. On April 29, 1935, a stockholders' committee reported that there was a capital deficit of $2,328,070, and that there was $878,768 in unpaid accumulated dividends on the three classes of preferred stock.

A committee of stockholders ascertained that ten or more years would be necessary to make up the capital deficit out of the earnings, and, if no dividends were paid, the amount of dividends at the end of the 10-year period would be $3,000,000 or more. At the estimated rate of earnings, such accumulated dividends in arrears could never be paid. It was evident that the common stock was valueless. In the report of the committee, it is stated: "The value of these accumulations is highly conjectural. The position of the present common stock as to dividends is even worse. The

deficit in capital not only falls primarily against that stock, but the common would have to await restoration of the capital deficit from earnings, and then further await the payment from earnings of the present as well as any future accumulations of unpaid dividends on said preferred issues. * * * .

"The prior rights of the present preferred classes in liquidation and their prior rights to dividends from earnings and the aforesaid deficit in capital make the equities of the present common stock of doubtful value."

A plan was formulated in 1935 for increasing the value of the common and class C preferred stock by the elimination of the accumulated dividends in arrears and by a reduction of the dividend rates. This necessarily would have reduced the value of the rights of the first and second preferred stock. The plan, in its final form, was submitted to the Corporation Commission in 1937. The Commission ruled that such an amendment to the charter could not be made without the unanimous consent of all stockholders. Thereafter, the company continued in business, making small annual reductions in its capital deficit from earnings but paying no dividends. By 1938 the capital deficit had been reduced, by the application of earnings, to $1,977,000, and the accumulated dividends in arrears had increased to $1,647,690. Again ten years was estimated to be the period necessary to eliminate the deficit from earnings. This made it even more obvious that in 1935 that the common stock was worthless and very probably the class C preferred also. These facts were recognized by the board of directors in a letter to all stockholders dated August 1, 1938, in which it was said: "On the basis mentioned, the holders of the Class C Preferred and Common stocks would probably receive no dividends during their lives."

It thus appears that, while the company needed neither new capital nor additional credit to continue a successful business venture, the provisions of the charter compelled the officers and directors to apply the earnings to the restoration of the deficit in capital and to the payment of accumulated

dividends in arrears, first, on the first preferred stock, and then on the other classes of preferred stock in order of priority. The result reveals that the first and second preferred stock for many years would absorb all earnings and that class C and the common stock for the same length of time would receive nothing from earnings. However, the corporation was solvent, as the current liabilities did not exceed $194,317 and the cash on hand and due from banks totaled $238,682.

Confronted with this intra-corporate problem, the officers and directors conceived a plan to increase the rights of the common and class C stock by decreasing the rights of the first and second classes of preferred stock. The end to be achieved was the same as the one submitted in the form of a charter amendment to the Corporation Commission and, as said, refused by it.

The plan was submitted to the directors of the corporation by a letter of July 22, 1938, and signed by three directors—David H. Dillard, J. T. Noell, Jr., and John M. Miller, Jr. On the same date, the plan was approved by the other members of the board of directors. The letter was directed to the Craddock-Terry Company and proposed to purchase "the whole of your properties and assets, including good will and all other intangible assets, as a going concern, and which shall include everything necessary to the continued conduct of business on your part, but not your franchise to be a corporation." The proposed consideration for the sale of all tangible assets of the corporation was a delivery to the Craddock-Terry Company of stock in a new corporation to be formed. This new stock was to be divided into four classes in number of shares equal to the number of shares of the corresponding classes of the Craddock-Terry Company then outstanding, plus an additional issue of common stock with no par value. Under the terms of this proposal, the Craddock-Terry Company would give to the holder of each share of its preferred stock one share of the corresponding issue of new stock in the proposed corporation and a slight bonus of new common stock with

no par value. The holders of the old common stock were to receive new common, share for share.

Attached to this letter was a copy of the proposed charter of the new corporation, denoted "The Craddock-Terry Shoe Corporation," in which certificate all the officers and directors of the old corporation were made officers and directors of the new corporation.

The letter of July 22, 1938, proposed that the old corporation give written notice to the holders of all outstanding stock of the proposed sale and the consideration offered therefor; and request the stockholders to consent to the sale, to agree to surrender and deliver to the Craddock-Terry Company for cancellation the shares of stock owned by the holders, and to accept from the Craddock-Terry Company their proportionate shares of stock in the new corporation. The letter further provides that the sale should not become effective unless eighty per cent. of the holders of the issued and outstanding stock of each class expressed their approval by written consent before February 1, 1939. As stated, the officers and directors of the Craddock-Terry Company approved the plan on the day it was submitted; and on August 1, 1938, they wrote each stockholder a letter, setting forth the offer and acceptance by the board, and attached thereto a paper, entitled "Authorization, Consent and Agreement," to be signed by the stockholder.

This "Authorization, Consent and Agreement" was signed by more than eighty per cent. of the holders of each class of stock issued and outstanding. However, W. D. Powell, a holder of 122 shares of first preferred stock and 66 shares of second preferred stock, by letter to the president of the company, declined to sign the "Authorization, Consent and Agreement," and claimed that he was entitled to receive all accumulated dividends in arrears and $110 per share—the value stated in the charter for the retirement of these two classes of preferred stock. This claim was denied by the corporation.

Thereupon Powell filed a petition in the Corporation Court of the city of Lynchburg, in which he prayed for

a declaratory judgment as to his right to the accumulated dividends in arrears on his stock. He alleged that he would not be able to vote intelligently on the proposal of sale unless this dispute was settled. The trial court held that the provisions of the charter and the certificates of stock did not entitle Powell to accumulated dividends in arrears, as such dividends could be paid only out of the earnings of the corporation. From that judgment Powell obtained an appeal to this court and, in an opinion (*Powell* v. *Craddock-Terry Co.*, 175 Va. 146, 7 S. E. (2d) 143), rendered by Mr. Justice Eggleston on February 26, 1940, the judgment of the trial court was affirmed.

The sale was perfected. The new corporation, now known as the Craddock-Terry Shoe Corporation, was duly incorporated under the management of the same officers and directors who managed the business of the old corporation and who, as officers of the old corporation, authorized and executed proper instruments conveying all the assets of the old corporation to the new corporation.

Under the provisions of the charter of the new corporation, the rights of preferred stocks in the old corporation were materially reduced. The substantial differences between the rights of the preferred stock in the old corporation and in the new corporation may be summarized as follows:

(1) All accumulated dividends in arrears on all three classes of preferred stock from 1930 to 1939, and all dividends to accumulate thereafter, were totally extinguished;

(2) Dividends were to be reduced on all the preferred stock for five years and on Class C preferred forever;

(3) The participating right of the first preferred was terminated;

(4) The protective covenants of the respective issues of preferred stock (prohibiting liens on the property and restricting dividends on the common stock, and, in the case of the class C preferred, providing for a sinking fund), were eliminated.

Powell, acting for himself and other owners of shares of first and second preferred stock similarly situated, elected to enforce his stock contract by instituting this suit in equity. To the bill the respondents filed a demurrer and other pleas raising various questions. However, before discussing the merits of the case, it is advisable to dispose of the question of election and estoppel raised by the pleas and the demurrer.

The provisions of the Acts of 1930, p. 791, amended in Acts of 1936, p. 302, Michie's Code 1942, sec. 3820a, hereinafter referred to as the sales statute, authorize a corporation (with certain exceptions) to sell all of its assets with the consent of the holders of two-thirds of all the outstanding stock of the corporation. Approval of such a sale may be obtained by the written consent of the stockholders, or it may be obtained at a regular or special meeting of stockholders provided the notice calling such meeting states that the question of the sale of assets will be submitted at the meeting.

The directors of the Craddock-Terry Company elected to pursue the former course, and, on November 14, 1938, the holders of the required amount of stock had signified their written consent to the proposed sale. The transfer of assets was actually made on January 23, 1939, but no official notice of the fact that the required number of stockholders had approved the sale was communicated to all stockholders until January 28, 1939, at a duly authorized meeting of the stockholders. Stockholders who are unwilling to participate in a sale of all corporate assets are required to give notice in writing of their dissent "within three months after the date of said meeting." The period of limitation began to run on January 28, 1939, and not on November 14, 1938, as appellants contend.

On the 15th day of April, 1939, well within the 3-month period, W. D. Powell caused a notice to be served on the president of the Craddock-Terry Company, in which it was stated that he was dissatisfied with the plan of sale and distribution and that he intended to institute a

proper suit in equity to enforce his rights as a stockholder. The suit was actually instituted on May 12, 1939. It was not instituted or conducted under the provisions of the statute "to appraise and determine the fair cash value of the stock." The bill is long. It contains many needless allegations and several inconsistent prayers. However, the dominant purpose of the suit, apparent from the allegations, prayers, answers and evidence taken on the issues raised, was to invoke the plenary powers of equity to enforce the right of preferred stock expressed in the charter.

Appellants contend that the pertinent provisions of the charter and the preferred stock certificates are not now enforceable contractual obligations of the corporation, nor are they enforceable contractual obligations as between the stockholders themselves.

This contention is based upon the fact that the board of directors of the corporation, with the consent of the holders of more than two-thirds of the stock of all classes, has consummated a sale of all the assets for stock in another corporation pursuant to the provisions of the Virginia sales statute, and that the result of such a sale modifies the contractual obligation of the stockholders and leaves dissenting stockholders only one remedy; namely, a recovery of the fair cash value of the stock on the day before the sale as determined by three disinterested persons.

Appellants' second basic contention is that the sale as outlined did not contemplate, nor did its execution result in liquidation of the Craddock-Terry Company.

The determination of the first contention necessarily involves the validity and the construction of the statute authorizing the sale of all corporate assets for securities as well as cash.

In the absence of an enabling statute, the common law rule, as pronounced by the majority of the courts, was that a sale of all the assets of a corporation for cash or securities could not be made without the unanimous consent of the stockholders. This rule was subject to certain exceptions, such as insolvency of the corporation, or when there

seemed no fair prospect of successful operation as then organized. *Geddes* v. *Anaconda Copper Mining Co.*, 254 U. S. 590, 595, 41 S. Ct. 209, 65 L. Ed. 425; 6 Fletcher Cyc. Corps., Perm. Ed., secs. 2946-2947, p. 1030; 18 C. J. S. 1194; 13 Am. Jur. 1112.

The minority rule was that a majority of stock could cause a sale of all corporate assets for any fair business reason. This court does not seem to have decided the question one way or the other. Some expressions (*obiter*), in *Cohen* v. *Big Stone Gap Iron Co.*, 111 Va. 468, 69 S. E. 359, Ann. Cas. 1912A, 203; and *Peters* v. *Waverly Water-Front Imp.*; *etc.*, *Co.*, 113 Va. 318, 74 S. E. 168, indicate that this court might have followed the minority rule.

In 13 Fletcher Cyc. Corps., Perm. Ed., sec. 5797, at p. 97, it is said: "But while the weight of authority denies to the majority stockholders the power to sell all the corporate property, where the corporation is solvent and prosperous, there are decisions authorizing such a sale in any case where the majority deem it expedient so to do, and the trend of the later decisions seem to be in favor of permitting such a sale by the majority, against the dissent of minority stockholders, whenever deemed expedient."

Where the consideration for the contemplated sale of the assets was securities in another corporation, a larger majority of courts refused to permit the transaction unless the proposed securities were easily convertible into cash at an established market value. *Treadwell* v. *Salisbury Mfg. Co.*, 73 Mass. (7 Gray) 393, 66 Am. Dec. 490; *Abbot* v. *Waltham Watch Co.*, 260 Mass. 81, 156 N. E. 897; *Calnan* v. *Guaranty Security Corp.*, 271 Mass. 533, 171 N. E. 830; Securities and Exchange Commission, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (hereinafter cited as S. E. C. Reorganization Report), 1938, pp. 464, *et seq.* Other courts permitted such a sale but gave dissenting stockholders a right to payment of the fair value of their shares.

The question of relief from a violation of these rules created additional uncertainty due to the equitable regard for balance of convenience. Some courts gave relief, from a conveyance of assets in violation of the above rules, by cancelling the sale and requiring reconveyance (*Eagleson* v. *Pacific Timber Co.*, 270 F. 1008), but the majority of the courts declined to give such drastic remedy in view of the severe damage that would ensue to the majority, and held that dissenting stockholders' rights were satisfied by a money award for the value of their stock (13 Am. Jur. 1112-14), this to be, however, such sum as the court deemed fair, irrespective of what the majority may have prescribed. *Geddes* v. *Anaconda Copper Mining Co.*, *supra.* See also *Patterson* v. *Shattuck-Arizona Copper Co.*, 186 Minn. 11, 244 N. W. 281.

Enabling statutes, authorizing corporations to sell all of their assets for cash or securities without the unanimous consent of the stockholders, have been adopted in thirty-nine states and the District of Columbia, thereby eliminating the rigors and uncertainty of the pertinent common law rules.

The Virginia statute, adopted in 1930 (Acts 1930, p. 792; Michie's Code 1942, sec. 3820a), is in line with this modern trend. The first two paragraphs prescribe the necessary steps to be taken in order for a corporation, with certain exceptions, to consummate a sale of all assets, including good wills, "for such consideration, either payable in cash, stock or securities of another corporation as the board of directors, in their discretion, may determine * * * ." Before such sale may be consummated, it must be authorized by the written consent of the holders of two-thirds of all stock issued and outstanding, whether or not any of such stock has voting power, or by the vote of holders of two-thirds in value of such stock at a duly convened meeting.

As stated, appellants rely upon the sales statute. Appellees do not attack the validity of the sale. To that extent they concede the validity of the two paragraphs mentioned. The controversy is over the construction and validity of that

part of the statute, hereafter quoted, which deals with the rights of dissenting stockholders.

The majority of the court now hold that the sales statute, as hereinafter construed, is not violative of any constitutional inhibition (sec. 158); that is, the legislature has power to authorize a corporation to sell all of its assets for cash or securities with the consent of two-thirds of the stockholders of each class of stock. This conclusion is based on the reasons stated by Judge Buchanan in *Winfree v. Riverside Cotton Mills Co.*, 113 Va. 717, 75 S. E. 309.

The grant of power to sell for securities is one thing; the distribution of the resulting proceeds is another. The sale is a transaction between two corporations with separate and distinct identities. The distribution of proceeds is a transaction between the selling corporation and its stockholders and is governed by the rules of liquidation and dissolution.

This question was investigated and discussed at length in the said S. E. C. Reorganization Report, made under the supervision of Honorable William O. Douglas, now Mr. Justice Douglas of the Supreme Court of the United States. In this report (pp. 579-80) it is stated: "Even after the sale of assets has been accomplished there still remains the important problem of distributing the proceeds of the sale among the stockholders of the vendor. For, although the corporation frequently sells its entire assets as a step toward dissolution, the sale of assets and the dissolution of the vendor are generally regarded as separate steps. The power to sell the entire assets of the corporation does not include the power to dissolve, nor does such power entitle the vendor corporation forthwith to distribute the proceeds of the sale to its stockholders. Some courts have said that a sale of assets works a practical dissolution of the vendor corporation; but it should be noted that a technical dissolution does not take place. The vendor, until technical dissolution, remains a corporate entity, has its own stockholders, and holds the consideration which it received in return for its assets. Dissolution of the vendor corporation and distri-

bution of its assets to its stockholders are largely governed by special statutes in most states. Thus, the sale of assets and the dissolution of the vendor corporation must receive the separate consent of the stockholders * * * .

"On several occasions attempts have been made to accomplish both a sale of assets and the dissolution of a corporation simultaneously and under the authorization of a single vote of the stockholders. But these attempts have been generally unsuccessful. The courts are reluctant to permit corporations to accomplish other results under the sale of assets statutes than the sale itself."

In 13 Am. Jur. 1116, it is said: "The sale of the entire assets of a corporation and the distribution of the proceeds of such sale among stockholders are separate matters between separate parties and based upon separate considerations; stockholders of different classes cannot be compelled to give their consent to one as a condition to their concurrence in the other."

In *Geiger* v. *American Seeding Machine Co.*, 124 Ohio St. 222, 177 N. E. 594, 79 A. L. R. 614, the facts were that a statute in Ohio authorized the sale of assets of a corporation when approved by two-thirds of the stockholders of all classes. An Ohio corporation entered a contract to sell and convey all of its assets to a Delaware corporation in consideration of stock in the Delaware corporation. This sale was approved by two-thirds of the stockholders, who, in writing, agreed to take the stock of the Delaware corporation as outlined in the proposal. The minority stockholders refused to agree and sought an injunction to enjoin the Ohio corporation from distributing the stock of the Delaware corporation received in exchange for its assets until the prior rights of preferred stockholders had been satisfied. The Ohio court granted the injunction and held that the sales statute did not give the selling corporation power to make a distribution among the stockholders, and that no contract between the buying and selling corporations could change the contract between the selling corpora-

tion and its stockholders even though such change was made a part of the terms and conditions of sale.

"Manifestly a contract between two corporations could not legally make terms which would be violative of a contract between one of the corporations and its stockholders, or which would alter the contract relations of different classes of stockholders of such corporations as between such classes." Such an agreement to distribute the proceeds of sale was not binding upon those who did not assent thereto. See *Finch* v. *Warrior Cement Corp.*, 16 Del. Chy. 44, 141 A. 54; 13 Am. Jur. 1116; 45 Harv. L. Rev. 1400.

These authorities hold that the powers granted under a sales statute were exhausted by the consummation of the sale. If the selling corporation desired to liquidate by distributing all of its assets (the proceeds of sale) among its security holders, it had to look elsewhere for authority— that is, to other statutes or to the charter provisions.

The State Corporation Commission of Virginia, in an unanimous opinion, *Ex Parte: Industrial Finance Corporation* (1926 Report of State Corporation Commission of Virginia, 148), rendered on April 17, 1926, held that the charter provision of a corporation, which gave the preferred stockholders the right to vote in the election of directors, was a valuable, vested right, and that the holders of the outstanding preferred stock could not be deprived of this right, in the form of an amendment to the charter, without their unanimous consent.

This court, in discussing the contractual relations between preferred stockholders and the corporation and between the stockholders themselves, in *Johnson* v. *Johnson*, 138 Va. 487, 494, 498, 122 S. E. 100, said:

"The language of each of these charters holds out the promise of anticipated preferential return upon the shares of the preferred stockholder in two contingencies:

"First: He is assured of this continuing or periodical return or dividend from the profits of the corporation, if any, in preference to any dividend on the common stock.

"Secondly: As an additional inducement, he is assured that in case of dissolution and distribution of the assets of the corporation between its various classes of stockholders, if the anticipated profits have proved insufficient to produce such a dividend or return upon its capital, then that he shall receive it upon such distribution of the capital assets in preference to any distribution of such assets to the common stockholders. While he is not a creditor of the corporation he has in the distribution of such assets, as between himself and the common stockholders, a preferential claim to the assets which is superior to the claim of the common stockholders, and this because the contract so provides.

" * * * The common understanding of such contracts is that the preferred stockholders take no risk either as to the return of par value of their stock, together with the limited dividends which they are conditionally promised thereon, if the assets for distribution are sufficient to reimburse them, and for this promise the preferred stockholders waive all expectation or possibility of any additional profit, however great the ultimate profits may be. These surplus profits in such cases belong to the common stockholders, and they on their part, for this hope of unlimited gain, grant to the preferred stockholders, who have no such opportunity, prior claims upon assets in liquidation, as well as upon earnings."

These citations are sufficient to show the settled law and the zealous regard for the rights of this class of stock in this jurisdiction. The enabling act, authorizing corporations, with certain exceptions, to sell all assets for cash or securities without the unanimous consent of the stockholders, must be read with these settled principles in mind. The grant of such powers is expressed in this language:

"To sell, convey and transfer * * * the whole of its property and assets, including good will, and other tangible assets * * * upon such terms and conditions, and for such consideration, either payable in cash, stock or securities of another corporation as the board of directors, in their

discretion, may determine; * * * provided * * * that any such sale * * * under the provisions of this act shall not affect (effect) a dissolution of the vendor corporation" (a two-thirds vote of stockholders or their consent in writing first to be obtained). (Acts 1930, p. 792; Acts 1936, p. 302; Michie's Code, sec. 3820a.)

The sales statute contains no language granting authority to liquidate by distribution. On the other hand, the act expressly limits its operation by providing that "any such sale * * * shall not effect a dissolution." The law is well settled that a mere alienation of all property of a corporation does not terminate its existence. See *Camden* v. *Virginia Safe Deposit, etc., Corp.*, 115 Va. 20, 27-28, 78 S. E. 596; *South Norfolk Land Co.* v. *Tebault*, 124 Va. 667, 670, 98 S. E. 679. It would be a strained construction to hold that the legislature used the words merely to retain the technical legal existence of the selling corporation. It is improbable that the legislature intended by this brief expression to overturn the whole basic law of priorities so as to substitute any new scheme which might be adopted by a two-thirds majority of stockholders in lieu of settled principles obtaining in liquidation. The reasonably clear meaning of this proviso is that the sales statute should not be used as a means for accomplishing a distribution of the proceeds, with the consequent liquidation and dissolution of the corporation, contrary to the method prescribed in the charter. The very language of the Virginia act is cited in the S. E. C. Reorganization Report (Pt. 7, pp. 579-80) as an authority for the following statement: "The power to sell the entire assets of the corporation does not include the power to dissolve, nor does such power entitle the vendor corporation forthwith to distribute the proceeds of the sale to its stockholders."

Appellants contend that, inasmuch as the sale and the distribution were parts of a single plan, they are inseparable so that the authorization of one includes the authorization of the other.

Frequently a single business purpose is achieved by separate legal steps, each of which must be judged by the legal rules separately applicable to it. The single purpose in refunding bonds is frequently to reduce the interest rate, but to accomplish that purpose there are two separate and distinct transactions. One is the redemption of the old bonds and the other is the authorization of the new bonds. Each step is controlled by its own separate rules.

Mr. George S. Hills, in "Consolidation of Corporations by Sale of Assets and Distribution of Shares," 19 Cal. L. Rev. 349, 352, et seq., said: "The agreement under which assets of one corporation are sold to another for its shares or securities usually outlines a plan of distribution whereby such shares or securities are to be distributed to the shareholders of the selling corporation upon an exchange basis, but there is no way of requiring the shareholders to surrender their shares and accept shares of the purchasing corporation. The plan of distribution is itself no part of the sale, and a distribution pursuant to the plan is a separate step following actual consummation of the sale itself. * * * " (P. 352.)

"The power of a corporation to sell its assets as an entirety does not include the power to distribute the shares, securities or other consideration received among its shareholders. * * * " (P. 353.)

"The shareholders of the selling corporation cannot be deprived of their contractual rights upon a liquidation, dissolution or winding-up of the corporation. * * * " (P. 354.)

"A sale of assets and a distribution to shareholders of the consideration received are separate and independent steps in the corporate procedure. Each has different problems arising from unrelated procedings." (P. 354.)

"Statutes which permit shareholders to dissent from a proposed sale of assets and demand an appraisal of their shares have no application to a distribution of the consideration received. Such statutes lead up to the sale itself, which is the half-way mark in the full procedure, and then

drop off, leaving the selling corporation and its shareholders with the task of distribution. * * * " (P. 355.)

"This power, * * * , must not be confused with the power to distribute the shares or securities received among the shareholders." (N. 12, p. 356.)

A similar statement is found in 17 Cornell Law Quarterly 271: "If the shareholder has assented to the sale of the corporate assets for stock, can he be compelled to exchange his shares for the shares of the vendee corporation? The courts have been practically unanimous in denying this power to the majority. The transfer of all the corporate assets has been treated as a practical dissolution as regards the non-assenting shareholders, and the rules as to distribution upon dissolution are held to govern."

The appellants urge that the third paragraph of the act, as amended in 1936, when construed with the merger statute (section 3822) means that the sales statute authorizes a distribution, and that the right of dissenters is fixed by the provisions of the sales statute and not by the charter of the selling corporation.

The pertinent provisions of the statute (Michie's Code 1942, sec. 3820a) are: "The rights of any stockholder of the vendor corporation, whether or not the said stock so held by him has voting power, who shall not have given his assent to such sale, conveyance or transfer, and who shall be dissatisfied therewith, shall be the same *mutatis mutandis* as that of a stockholder of a consolidated or merged corporation, who shall not have given his consent to such consolidation or merger and who shall be dissatisfied therewith, and the same procedure *mutatis mutandis* to ascertain the fair cash value of his stock shall be had, as now or may be hereafter provided by statute in case of such stockholder of a merged or consolidated corporation *and/or as now exists under the general law;* provided, however, that the value so ascertained shall be paid to such stockholder by the vendor corporation and the purchaser from the vendor corporation shall in no wise be liable to such stockholder for the value of his stock, *but nothing herein contained shall*

*deprive any stockholder of existing remedies at law or in equity in the event of fraud or inadequacy of consideration, \* \* \* ."* (Italics supplied.)

The pertinent provisions of Michie's Code 1942, sec. 3822, provide that any stockholder, who shall not have assented to a consolidation or merger agreement and who shall fail to dissent within three months after the date of said meeting which authorized the merger or consolidation, "shall be forever precluded from objecting to the consolidation or merger and shall be deemed to have elected thereby to participate in the agreement or plan of consolidation or merger on the basis therein provided for stockholders of his class, and such stockholders shall not thereafter be entitled to demand or receive the fair cash value of his stock in his corporation, but the rights of such stockholder shall thereafter be confined to participation in the agreement or plan of consolidation or merger, and to the stock of the consolidated or merged corporation to which he may be entitled, and all rights of such stockholder under the stock of the consolidating or merging corporation shall thereupon cease and determine."

■ If the provisions of these two statutes are construed to mean what the appellants contend they mean, then the legislature has empowered a two-thirds majority of stockholders in a solvent corporation to eliminate at will the contractual obligations (and what have been regarded heretofore as vested rights) of preferred stockholders. To read this meaning into the statute raises a serious constitutional question. See *Commonwealth* v. *Portsmouth Gas Co.*, 132 Va. 480, 112 S. E. 792; *Phillips Petroleum Co.* v. *Jenkins*, 297 U. S. 629, 56 S. Ct. 611, 80 L. Ed. 943; *Coombes* v. *Getz*, 285 U. S. 434, 52 S. Ct. 435, 76 L. Ed. 866; *Vanden Bosch* v. *Michigan Trust Co.*, 35 F. (2d) 643; *Yoakam* v. *Providence Biltmore Hotel Co.*, 34 F. (2d) 533; *Midland Co-Operative Wholesale* v. *Range Co-Operative Oil Ass'n*, 200 Minn. 538, 274 N. W. 624, 111 A. L. R. 1521; *Huber* v. *Martin*, 127 Wis. 412, 105 N. W. 1031, 1135; *Sutton* v. *Globe Knitting Works*, 276 Mich. 200, 267 N. W. 815, 105

A. L. R. 1447, and note beginning on page 1451; *Breslav v. New York, etc., Power Co.*, 249 App. Div. 181, 291 N. Y. S. 932; *Morris v. American Public Utilities Co.*, 14 Del. Chy. 136, 122 A. 696; *Keller v. Wilson & Co.*, 21 Del. Chy. 391, 190 A. 115; *Romer v. Porcelain Products* (Del. Chy.), 2 A. (2d) 75; *Fidelity Bldg., etc., Ass'n v. Thompson* (Tex. Comm. App.), 51 S. W. (2d) 578; 13 Fletcher Cyc. Corp. (Perm. Ed.), sections 5774-5776.

The legislature, in the exercise of this power, has no right to enact a law which impairs vested contractual rights. This limitation of power was clearly recognized by this court in *Winfree v. Riverside Cotton Mills Co.*, 113 Va. 717, 723, 75 S. E. 309, where this is said: "Although the power reserved is to alter, amend, or repeal the charter, it is not limited to changes or alterations solely between the State and the corporations, but authorizes amendments and alterations, *within certain limitations,* directly affecting the stockholders in their relations to the State, to the corporation, and to each other." (Italics supplied.)

If the legislature intended to grant such powers to a corporation, the natural place for such grant would be in the sales statute. Looking at the sales statute itself, there is found a creation of power to make sale. No reference is made to distribution of the proceeds. The use of the words *mutatis mutandis* in the statute indicates that the provisions of the merger statute, which are not pertinent to the transaction of sale, shall not apply.

Plans for the consolidation or merger of two or more corporations must be approved by the Corporation Commission. No similar safeguard or restriction is found in the sales statute. As we construe the statute, none is necessary.

The only reasonable construction seems to be that the reference in the sales statute to the merger statute adopts merely the procedure for appraisal provided for therein. Any other interpretation of this reference would contradict the limiting proviso that any such sale shall not

effect a dissolution. Interpretation which leads to contradictions within the act is not permitted.

This interpretation is in line with the law prevailing in other jurisdictions. See authorities cited *supra*. We said, in *Jones* v. *Rhea*, 130 Va. 345, 107 S. E. 814, that "to doubt is to deny" because "'all statutes under which corporate power is asserted must be construed against the grant of power.'"

The contention that the statutory remedy provided by the sales statute is exclusive is untenable. This contention ignores such words "or as now exists under the general law," and also the provision in section 3820a providing that nothing in the statute contained "shall deprive any stockholder of existing remedies at law or in equity in the event of fraud or inadequacy of consideration." The proceeding in the case under consideration was not brought to avail of the summary statute any remedy of appraisal. No appraisal was asked for and no appraisers were appointed. It is a plenary proceeding in equity to enforce the rights of the appellees as stockholders of the selling company, and the appellees expressly disclaimed any desire for such appraisal and expressly asked for the liquidation value of their stock consequent upon the distribution. It is settled by the decisions of this court that the existence of a summary remedy of appraisal and payment under the sales statute does not make the remedy at law adequate in such manner as to defeat equity jurisdiction, and that the existence of such remedy does not otherwise foreclose the plenary jurisdiction of a court of equity to grant an injunction in advance of action or to grant a money award on equitable principles after action. In *Winfree* v. *Riverside Cotton Mills Co., supra,* it was said, in reference to the summary remedy of appraisal provided by a statute similar to section 3822 of the Code, that "while this summary remedy is given by the statute and the appellant might have pursued it, he was not bound to do so. Although the consolidated statute took away from him the right to defeat the consolidation by refusing to assent to it, it did not take away from him the right to refuse to

surrender his stock for stock in the new corporation or to refuse to take anything for it less than the actual value at the date of the consolidation. *Barnett* v. *Philadelphia Market Co.*, 218 Pa. St. 649, 67 Atl. 912." See, also, *Jones* v. *Rhea*, 130 Va. 345, 107 S. E. 814; *General Inv. Co.* v. *Lake Shore*, etc., *Ry. Co.*, 250 F. 160, 174.

Under the provisions of the charter, the holders of the first preferred stock were entitled to be preferred as to the assets on liquidation and the holders of the second preferred stock, subject to the prior rights of the first preferred stock, were entitled to preference over Class C preferred stock and the common stock in the event of liquidation.

Appellants contend that the plan "did not contemplate, nor did its execution result in, a liquidation of that company's (Craddock-Terry) affairs."

The conceded facts do not support this contention. On January 23, 1939, the date of the transfer of the assets, the old corporation owed no funded debt but only current obligations. The new ·company assumed the payment of these obligations, both expressly, in the agreement of purchase, and necessarily, as a matter of law. On and after that date, the assets of the old corporation consisted of the entire issue of stock in the new corporation. As soon as the stock in the new corporation was isued and delivered to the directors and management of the old corporation, they caused ninety-five per cent. of it to be distributed to the stockholders in the old corporation who had agreed to the plan and had surrendered their shares of stock in the old corporation. This left the old corporation a mere shell with no assets with which to conduct business. It had a franchise from the State but no assets with which to pay the annual franchise tax. This was forfeited on May 1, 1942, by the State Corporation Commission because of the failure of the old corporation to pay the annual registration fee and franchise tax against it for the two preceding years.

The plan contemplated that all of the assets of the old corporation should be transferred to the new corporation, and that the new corporation should conduct the business

formerly conducted by the old corporation as its successor, with not one dollar of new assets or additional credit. The debts of the old corporation have been paid and discharged to the satisfaction of all creditors.

It is obvious that neither the buyer nor the seller contemplated the continued existence of the Craddock-Terry Company after the consummation of the sale and the distribution of the proceeds. It was the intention of the buyer and the intention of the seller, who were managed and controlled by the same parties, to permit the Craddock-Terry Company to die and be buried with statutory honors. It follows that this formal and technical dissolution of the corporation was a part and parcel of the whole transaction. The transfer of all the assets has in fact resulted in a dissolution of the old corporation.

Code, sec. 3812, as amended by the Acts of 1936, p. 336, provides: "Upon the dissolution, expiration or revocation by operation of law of any corporation, the directors or other governing body, by whatever name it may be known, unless action to the contrary be taken as provided in the following section, shall be trustees thereof, with full power to settle the affairs, collect the outstanding debts, sell and cause to be conveyed property, real and personal, and divide the money and other property among the stockholders, according to their respective rights, after paying its debts."

Mr. Justice Eggleston, in *Fidelity, etc., Co.* v. *Lackland,* 175 Va. 178, 191, 8 S. E. (2d) 306, speaking for the court, said: "It is the contention of the Surety Company that the revocation of the charter of the corporation for the failure to pay its registration fee and franchise tax did not work a 'dissolution' of the corporation within the meaning of Code, section 3812, as amended, and hence, it says, the plaintiffs had no right to proceed thereunder.

"Sections 210 and 211 of the Tax Code, as amended, Code 1936, Appendix, p. 2464, provide that the failure of a domestic corporation to make payment within the prescribed time of its registration fee and franchise tax shall

'operate without further proceedings as a revocation and annulment of the charter of said corporation.'

"We think it is too plain for argument that the 'revocation and annulment of the charter' of this corporation for the failure to pay its taxes, was a 'dissolution, expiration or revocation by operation of law' of the corporation within the meaning of section 3812, as amended."

It is obvious that it was the intention of the old corporation, when it executed the contract of sale, to distribute the resulting proceeds to its stockholders. The old corporation planned a full and complete settlement of all its affairs. It arranged for the payment of all its obligations. It transferred the "bills receivable"—that is, "outstanding debts" due it. It sold and caused "to be conveyed (all its) property, real and personal," including cash on hand, and divided the "other property among the stockholders," but not "according to their respective rights." When the transaction was consummated, there remained no assets, and it was planned that there should be none, with which to pay a registration fee and the franchise tax. While a technical dissolution did not actually take place until May, 1942, a practical dissolution occurred when the old corporation sold its assets and distributed the proceeds. See *Continental Ins. Co.* v. *United States*, 259 U. S. 156, 176, 42 S. Ct. 540, 66 L. Ed. 871; *Petry* v. *Harwood Elec. Co.*, 280 Pa. 142, 124 A. 302, 33 A. L. R. 1249, 1253; 13 Am. Jur., sec. 1293, p. 1163.

"A distribution of all assets" is "a winding-up of the affairs" of the corporation and is synonymous with "liquidation." In *Butler* v. *New Keystone Copper Co.*, 10 Del. Chy. 371, 93 A. 380, 385, there was a proposed sale for stock to be followed by a distribution of the proceeds. No creditors' rights seem to have been affected. The court said: "A distribution of all the assets would clearly be a winding up which could be done legally only in the method provided by law."

In *People of Colorado* v. *Great Western Sugar Co.*, 29 F. (2d) 810, a New Jersey charter provided certain rights for

a preferred issue "in case of liquidation or distribution of assets" and the court said: " * * * It is very evident under the common sense rule of construction, to which we have adverted, that the words 'distribution of assets' and 'liquidation' mean one and the same thing."

Appellants cite numerous cases which define "liquidation," as applied to corporations, to mean the winding-up of the affairs of a corporation, settling with its debtors and creditors and distributing the remaining assets to its stockholders. Among the cases cited are: *Gibson* v. *American Ry. Exp. Co.*, 195 Iowa 1126, 193 N. W. 274; *Hellman* v. *Helvering*, 68 F. (2d) 763, 765; *Northwest Bancorporation* v. *Commissioner of Internal Revenue*, 88 F. (2d) 293; *Rohr* v. *Stanton Trust, etc., Bank*, 76 Mont. 248, 245 P. 947; *Lafayette Trust Co.* v. *Beggs*, 213 N. Y. 280, 107 N. E. 644. That is what was done in this case, except that more than eighty per cent. of the stockholders agreed with the directors for the distribution to be on a basis different from that set forth in the charter and the stock certificates; but such modification of the method of distribution from that stated in the charter has no binding effect on the dissenting stockholders.

If the sale had been for cash instead of securities, it is apparent that the directors would have been compelled to make the distribution in accordance with the stipulations in the charter. It seems equally apparent that the relative rights of the respective classes of security holders cannot be varied merely by the medium of payment.

"The rights (in a Massachusetts charter) thereby established with respect to the stockholders as among themselves and between the stockholders and the corporation are contractual. * * * Agreements voluntarily made between such persons are to be held sacred and enforced by the courts, and are not to be lightly set aside on the ground of public policy or because as events have turned it may be unfortunate for one party." *Crimmins, etc., Co.* v. *Kidder Peabody Accept. Corp.*, 282 Mass. 367, 375, 379, 185 N. E. 383, 88 A. L. R. 1122.

In *Drewry-Hughes Co.* v. *Throckmorton,* 120 Va. 859, 865, 92 S. E. 818, it is said: " \* \* \* a stipulation plainly made between the stockholders, or classes of stockholders, as to how the assets of the corporation shall be distributed among the stockholders in liquidation, after all claims upon the corporation by creditors and others have been satisfied, is permissible and valid and is not forbidden by the principles of our corporation law."

It follows that it was the duty of the Craddock-Terry Company, when it received stock in the new corporation, to hold the same, subject to the satisfaction of the senior claims of its preferred stockholders in full, before anything could be legally paid on the class C preferred and common stock.

In *Geiger* v. *American Seeding Machine Co., supra,* at page 623, it is said that the operation of a sales statute " \* \* \* must result in awarding to the dissenting stockholder a fair cash value which will be the equivalent of his contract, viz., the par value of the certificate plus all unpaid dividends. The Legislature could only have power to impose an exclusive remedy upon unwilling and nonconsenting stockholders, if such stockholders receive the full par value of the stock, unless the entire assets of the corporation are insufficient to realize such full par value. The articles of incorporation having provided that the common stockholders shall receive nothing until after payment in full to the preferred stockholders, and the statute on May 14, 1929, containing no provision relating to distribution otherwise than in strict accordance with the stock certificates and the articles of incorporation, it must be held that distribution in any other manner, or which would not give to the preferred stockholders all assets up to the amount of the par value of their stock, would be an impairment of the obligation of the contract."

The Delaware court, in *Robinson* v. *Pittsburgh Oil Refining Corp.,* 14 Del. Chy. 193, 126 A. 46, refused to enjoin a sale of all assets of a corporation on the ground that the consideration for the sale was fair. However, the court

expressly pointed out that, in any subsequent transaction of distribution, not only the· cash part of the consideration but the new stock, given as a part of the purchase price, should be paid the holders of the old preferred stock since the cash was not sufficient to satisfy the dissenting stockholders' liquidating preference. On this point the court said: " \* \* \* in no case could the common stockholders of the old corporation receive the $101,182 par value of common stock of the new corporation, as appears to be the view of the complainant, because the new common stock would constitute a portion of the assets of the old corporation. On dissolution· and distribution of the assets of the latter, the preferred stock would have sufficient preference rights to take it all to the exclusion of the common stock."

Mr. Edward W. Simms, in 15 Virginia L. Rev. 763, said: " \* \* \* the contract to pay upon dissolution or liquidation can, only mean upon dissolution of the corporation itself as distinguished from its business. \* \* \* The plain intent of the contract is that if the corporation shall pass out of existence, the stockholder shall have certain rights, and that those rights shall mature when it shall become dissolved. The corporation may dispose of all of its assets but, if its existence continues, those rights have not matured. On the other hand, if its existence has ceased, the stockholder's right to demand performance has matured and is enforceable." See *Petry* v. *Harwood Elec. Co., supra;* 13 Am. Jur. 1163; 18 C. J. S. 1196.

We said, in *Johnson* v. *Johnson, supra:* "While he (the preferred stockholder) is not a creditor of the corporation he has in the distribution of such assets, as between himself and the common stockholders, a preferential claim to the assets which is superior to the claim of the common stockholders, and this because the contract so provides."

We have already construed the contract in question to mean that the preference in liquidation applies to the stockholders' investment; that is, the value of preferred stock without accrued dividends. *Powell* v. *Craddock-Terry Co.,* 175 Va. 146, 7 S. E. (2d) 143.

The next question to be determined is the amount appellees are entitled to recover under the contract expressed in the charter and the stock certificates.

This contract provides that "in liquidation," so much of the assets as may be necessary shall be applied, first, to the payment of $100 par value to all holders of first preferred stock and, second, to the payment of $100 par value of the second preferred, before distribution of any assets can be made to the holders of class C preferred and the holders of common stock. This method of distribution was not followed.

The trial court, in order to determine the value of the assets, referred the cause to a special commissioner, who was directed to determine what would have been the value of the stock in the new company if all of it had been sold immediately after it was received by the old corporation, and what was the "fair cash value" of the shares of appellees in the old company on the 13th day of November, 1938, the day before appellants claimed the sale was authorized, and on January 22, 1939, the day before the assets of the old corporation were transferred to the new. The trial court stated that the last inquiry was, in its opinion, unnecessary, but, at the suggestion of counsel, it was made a part of the decree of reference.

The determination of what is a "fair value," "fair cash value," "full value," or "fair and equitable value" is a question not always easily answered. See "The Problem of Judicial Valuation," 27 Col. L. Rev. 493. " 'Value' is a word of many meanings. * * * as between buyer and seller, the good will and earning power due to effective organization are often more important elements than tangible property." Mr. Justice Brandeis, in *Southwestern Bell Tel. Co.* v. *Public Service Comm.*, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807.

The uncertainty of the answer to the question is illustrated in the extensive investigation and report of the commissioner on the hypothetical questions referred to him. He found that the "cash value" of the assets, if they were sold

in an orderly liquidation, was $1,380,452, which would entitle the first preferred stockholders to receive $100 per share and the second preferred to receive only $10.44 per share. Yet the net value placed thereon by the new company on January 23, 1939, was $3,125,941.18. The same assets had been valued at $4,946,204.13 on the books of the old corporation.

The permission to use the distinguishing words "Craddock-Terry" in the name of the new corporation, the fact that the business was taken over as a going concern, and the prospective earning power of the new corporation are intangible of considerable value, but it is impossible to ascertain with any degree of certainty the concrete value to be placed on these items. However, inasmuch as the dividends paid to the holders of the junior classes of stock in the new corporation exceed the maximum amount to which appellees are entitled, it is useless to pursue this line of investigation.

On dissolution, the board of directors of a corporation, free of debt, holds the assets as a trustee to be paid or distributed to each class of stockholders in the order of priority stated in the charter.

The stock in the new corporation represented all the assets formerly in possession of the old corporation. Any dividends or income on such stock were assets to be distributed in accordance with the charter of the old corporation. Ninety-five per cent of the stockholders have agreed to a different, distribution, but such an agreement is not binding upon appellees who have not assented thereto. To that extent the priority rights of appellees, as holders of first and second preferred stock, were sacrificed for the benefit of the two junior and subordinate classes of stock.

In May, 1939, within five months after the sale was consummated, a dividend was declared on the first, second and third preferred stock of the new corporation. Thus the payment of the dividend to the third preferred was the same as a payment to the holders of class C preferred in the old corporation. In December, 1939, another dividend

was paid on all classes of outstanding stock, including the common stock, in the new corporation. The report of the president to the new corporation shows that, on November 30, 1940, in addition to the dividends paid on the first and second preferred stock, the sum of $29,868 in dividends was paid on the third preferred and the sum of $43,182.16 was paid on the common stock, a total of $73,050.16 paid to the holders of the junior classes of stock. The commissioner reported that the sale of the third preferred stock by local brokers from January 23, 1939, to March 11, 1941, averaged $33 per share, indicating a total market value of $328,548 for 9,956 shares outstanding. During the same period, the average market value of the common stock was found to be $12.80 per share, indicating a total market value of $552,720 for 43,181¼ shares outstanding. In other words, approximately two years from the date of distribution (illegal, so far as appellees are concerned), the aggregate market value of the stock, as indicated by sales on the local market, transferred to the holders of the junior claims was $881,268, plus dividends actually paid to them. These results were achieved under the same management with no additional assets.

Under these circumstances, to hold that the value of each share of first preferred and second preferred stock held by appellees was less than par on the day of distribution would be highly inequitable.

In *In re Utilities Power, etc., Corp.*, 29 F. Supp. 763, at 769, this is said: "A creditor has the first call on the assets of the debtor, a secured creditor must be preferred to an unsecured creditor in the distribution of the property or the proceeds of the property on which the secured creditor has a lien. On any distribution of the assets of a corporation having issued both preferred and common stock, if the assets are insufficient to satisfy the rights of the preferred stockholders, the common stockholders may not participate in the distribution. These are property rights which may not be disturbed even in bankruptcy."

Again, in *In re Chicago Great Western R. Co.*, 29 F. Supp. 149, 160: "It would be unfair to allocate anything of value to the present common stockholders prior to full settlement of the preferred stockholders' interests."

There has been a liquidation and dissolution of the old corporation. Appellees were entitled in the distribution to receive the par value of their stock before any distribution was made to the subordinate classes of stock. However, the distribution has been made and the junior classes of stockholders have received assets far in excess of the amount to which appellees are entitled under their liquidating preference. This being true, the holders of the junior classes of stock and all other parties who participated in the distribution are now estopped from asserting their own wrong to prevent appellees from recovering the par value of each share of stock owned by them with interest from January 23, 1939. See *Kremer* v. *Public Drug Co.*, 41 S. D. 365, 170 N. W. 571; *Petry* v. *Harwood Elec. Co.*, *supra*; *Southern Mutual Aid Ass'n* v. *Blount*, 112 Va. 214, 70 S. E. 487.

The views hereinbefore expressed concerning the preference to be accorded to the second preferred stock find strong support in the case of *Putnam* v. *Slayback*, 23 F. (2d) 406, decided by the Circuit Court of Appeals for the Fourth Circuit, where it was held that stock preferred as to assets on distribution or liquidation, should be first paid in full before anything should be paid to the holders of the common stock. The facts were that the Carbon Steel Company was originally a New Jersey corporation, incorporated on July 28, 1892. On October 12, 1894, the corporation was transferred from New Jersey to West Virginia and a charter issued by it in the latter State. Three classes of stock were issued by the Company in the amounts following: 5,000 shares of first preferred stock, entitled to a noncumulative dividend of 8 per cent. per annum; 15,000 shares of second preferred stock, entitled to a noncumulative dividend of 6 per cent. per annum; 30,000 shares of common stock. Nothing was said in any of the certificates of stock

of either class as to priority in the distribution of capital assets. On August 7, 1894, a resolution was passed by the stockholders of the New Jersey corporation, authorizing the conveyance of its property to the West Virginia corporation, but stipulating that "the preferred stock to be issued under the same conditions as now exist as to the said stock of the present company." The statute of New Jersey then in force (General Corporation Act of New Jersey, 1875, Section 80, as amended by laws New Jersey 1877, p. 74, section 1) provided that preferred stock should have preference over common stock. On October 22, 1894, the directors of the New Jersey corporation, acting pursuant to the resolution of the stockholders, transferred all the property of the New Jersey corporation to the West Virginia corporation in exchange for the latter's stock, and the stockholders of the West Virginia corporation accepted the transfer upon the terms set forth in the resolutions of the New Jersey corporation. The resolution of the West Virginia stockholders further provided "that it was the intention of the stockholders of both companies that the preferred stock of the West Virginia corporation should have the same priorities as had attached to the preferred stock of the New Jersey corporation." The transfer was duly carried out and the corporation continued in business under the West Virginia charter until the year 1922, when it ceased the transaction of the manufacturing business, and on January 23, 1923, the stockholders of the West Virginia corporation authorized the liquidation of the company's capital assets and duly appointed a liquidating committee composed of its board of directors. On October 20, 1925, the board of directors passed a resolution stating that the company had ceased to do business, had disposed of practically all of its assets, and directing that the money in the possession of the company, amounting to about $250,000, be distributed among all the stockholders of the company, making no distinction as to the class of the stock held. Complainants then filed their bill, asking that the company be enjoined from distributing the money on hand equally among all the stockholders, and

asking that the holders of the preferred stock be first paid in full before anything should be paid to the holders of the common stock. The Judge of the District Court entered a decree granting the relief prayed for and directing that the holders of the preferred stock of both classes of preferred stock should share equally in the distribution of the funds to the exclusion of the holders of the common stock, from which decree an appeal was taken to the Circuit Court of Appeals. The Circuit Court of Appeals in affirming the decree of the District Court held that, on liquidation of a corporation organized in New Jersey and later transferred to West Virginia, holders of preferred stock were entitled to the funds to the exclusion of the holders of common stock, and that the fact that the corporation was wound up by the officers and not under the direction of a court did not alter the rights of the parties, nor change the method of distribution. Northcutt, Circuit Judge, delivering the opinion of the Court, said:

"The question then arises as to what rights the various classes of stock had when issued by the New Jersey corporation, under the law of the state of New Jersey. The General Corporation Act of New Jersey of 1875, as amended by chapter 55 of the Laws of 1877, provided, after payment of all allowances, expenses, and costs and the satisfaction of all special and general liens upon the funds of the corporation to the extent of their lawful priority, 'the creditors shall be paid proportionately to the amount of their respective debts, * * * and the surplus funds, if any, after payment of the creditors and the costs and expenses as aforesaid. and the preferred stockholders, may be divided and paid to the general stockholders proportionately, according to their respective shares.'

"It is contended by appellants that section 18 of the Statutes of New Jersey of 1896 (Laws 1896, p. 283) mentions insolvency as a condition precedent necessary to the priority of preferred stock over the common stock, and that in the absence of a receivership in a court proceeding all classes of this stock should participate equally in the

distribution of capital assets. We do not think this was the law of New Jersey prior to 1896. In *McGregor* v. *Home Ins. Co.*, 33 N. J. Eq. 181, decided in 1880, the court held that at that time in New Jersey preferred stockholders were entitled to priority over holders of common stock in the distribution of capital assets upon dissolution by the corporation itself, to the extent of the par value of the preferred stock. To hold that the fact that the corporation is being wound up by its officers and not under direction of a court would completely alter the status of the various classes of stock and would be an absurdity. The court says:

" 'The fact that this corporation is being wound up by its officers, and not under the direction of this court, does not alter the rights of the parties nor change the method of distribution. The primary object of the statute, so far as it affects stockholders, was to define their rights; and the rule it prescribes upon that subject must be taken as the measure of their rights, whether they are wrought out by the court or through some other instrumentality.' * * *

"It is admitted that under the law of New Jersey at the time of the first transfer of this stock (1894) there was no distinction between the first and second preferred stock as to distribution of assets. In his opinion in the court below the judge says:

" ' * * * I am of opinion that the acceptance of the property of the New Jersey corporation, by the West Virginia corporation, upon the conditions above set out, as to preferred stock, in effect created a contract with the preferred stockholders, under which they are entitled to be treated as if this were a New Jersey corporation, instead of a West Virginia corporation, and that, when the preferred stockholders exchanged their New Jersey stock, for the West Virginia, they did it upon condition that the preferred stock had the same rights in the West Virginia corporation that it had had in the New Jersey corporation. I am further of the opinion that the present holders of the common stock, whenever they may have purchased their stock, held it under the same condition as it was issued in 1894.

" ' * * * Therefore I hold that the preferred stock, including the first and second issues, are entitled to receive proportionately the amount of assets remaining, after the payment of debts and the expenses belonging to the West Virginia corporation.'

"We think the conclusions reached by the learned trial judge were correct in every particular, and the decree is accordingly affirmed."

The foregoing conclusions necessitate the modification of the decree of the trial court in two particulars: (1) W. D. Powell will be allowed to recover for each share of second preferred stock $100, its par value; and (2) interest will be allowed on the total amount of recovery from January 23, 1939, the date the old corporation transferred the assets to the new corporation, instead of January 23, 1940. As thus modified, the decree of the trial court is affirmed.

*Modified and affirmed.*

CAMPBELL, C. J., GREGORY and BROWNING, JJ., dissenting.

BROWNING, J., dissenting.

I was the author of the majority opinion in this case which was handed down on October 12, 1942, and which appears in *Craddock-Terry Co. v. Powell*, 180 Va. 242, 22 S. E. (2d) 30, when the convictions of the majority appeared immutable.

I adhere to the views therein expressed, and now incorporate in this, portions thereof, which I wish to emphasize.

The statutes, the provisions of which, constituted the warrant for the procedure of the Craddock-Terry Company in this case are sections 3820a and 3822 of the Code of Virginia.

At the end of the first paragraph is this significant proviso:

"and provided, further, that any such sale ·or lease under the provisions of this section shall not affect (effect) a dissolution of the vendor corporation." The parenthetical

word is employed by us as correcting what is a patent typographical error.

"The appellees barricade themselves behind the provisions of the charter amendment of January, 1913, and similar language incorporated in their stock certificates. Paragraph (b) is as follows: "All preferred stock issued under authority of this resolution shall be preferred as to earnings to the extent of six per cent per annum, and said dividends shall be cumulative, and said preferred stock shall also be preferred as to assets in liquidation."

This is urged as their authority for the position that the plan proposed by the board of directors and adopted by more than 80% of the stockholders was really a liquidation of the assets of the old company.

The judge of the trial court adopted the view of the appellees, holding that the plan of sale contemplated distribution and liquidation of all of Craddock-Terry Company's assets, and from a practical standpoint it resulted in a dissolution of the corporation. He said, among other things: "The Virginia statutes as I read them do not deal with distribution in liquidation. Certainly not in terms. And if it could be fairly said that they did, the result would not be changed, because I would have no hesitancy in saying that any such attempted impairment of the contract obligations of the holders of the several classes of stock would be unconstitutional."

The majority opinion approves and affirms this statement. I do not regard it as a sound exposition of the law. The statutes referred to are ignored as to the effect for which they were conceived and the decision of this court expressed in the majority opinion is in the face of the decision of this court in the case of *Winfree* v. *Riverside Cotton Mills Co.*, 113 Va. 717, 720, 75 S. E. 309, 310.

It is true that that case had to do with the consolidation of two or more corporations, but it dealt with the rights of dissenting stockholders and much of what was said there is applicable to the conditions here.

In speaking of the reservation of the power to the state to alter and amend the charter of a corporation this court, in that case, said:

"It seems that such a reservation of power to the state prescribed by the laws in force when the charter is granted, whether written in the Constitution, in general laws, or in the charter itself, qualifies the grant, and that the subsequent exercise of that power cannot be regarded as an act impairing the obligation of contracts."

The rule as expressed in *Winfree* v. *Riverside Cotton Mills Co., supra* has received very general acceptance.

The case of *Germer* v. *Triple-State Natural Gas, etc., Co.,* 60 W. Va. 143, 54 S. E. 509, furnishes an apposite and persuasive precedent, here.

We quote from the brief of the appellants counsel filed on the re-hearing of this case:

The transaction there involved was spoken of as a "sale" of all of the property of a corporation in return for shares of stock in a new corporation which, upon organization, was to "purchase," among other property, all of the assets of the original corporation and assume all of its obligations. The purchasing corporation was to issue its securities which were in part to be given to the stockholders of the vendor corporation in exchange for their stock.

There was dissent on the part of certain of the stockholders, who relied upon substantially the same considerations as the dissidents in the instant case as grounds for invalidating the transaction. It was held that the empowering statute, which authorized the sale and disposal of the property of the corporation by the affirmative vote of the holders of at least 60% of the outstanding stock was constitutional, notwithstanding it was enacted after the granting of the corporate charter and after the contract rights between the stockholders had taken effect and that the "sale" was therefore valid. The Court said in this connection (citing numerous authorities):

"When the Triple-State stock was subscribed for by the stockholders, they did so charged with a full knowledge of

the statutory provisions then existing under which the legislature might, at any time, alter, amend, or repeal the provisions of the law which were made a part of the charter . . . . The broad reservation to the legislature to 'Amend, alter or repeal' the provisions of the statute under which corporations operate are as though written into every charter issued thereunder, and every subscriber to the stock of any such corporation is charged with full knowledge of the provisions of the law then existing, under which the legislature might, at any time, amend, alter, or repeal the provisions of the law which were so made a part of the charter, and such subscriber must be held to have given his consent that such change might at any time be made by the legislature. This being true, it cannot be claimed, with good reason, that by such action the legislature would be impairing the obligation of any contract the subscriber entered into when he became a stockholder."

It is true that in *Trustees* v. *Woodward*, 4 Wheat. (17 U. S.) 518, 4 L. Ed. 629, it was held that the charter of a corporation was a contract and that the same could not be impaired by subsequent legislation, but it will not be overlooked that in the concurring opinion of Mr. Justice Story, the principle for which we contend was recognized and clearly stated, when he said that when the Legislature granted a charter for a corporation a "provision in the Statute reserving to the Legislature the right to amend or repeal, it must be held to be a part of the contract itself, and the subsequent exercise of the right would be in accordance with the contract, and could not, therefore, impair its obligation."

The consequence which follows from this reservation is set out in *Stanislaus County* v. *San Joaquin, etc., Irrigation Co.*, 192 U. S. 201, 24 S. Ct. 241, 48 L. Ed. 406, as follows:

"The original incorporators or subsequent stockholders took their interests with knowledge of the existence of this power, and of the possibility of its exercise at any time in the discretion of the legislature." (See also *Greenwood* v. *Freight Co.*, 105 U. S. 13, 26 L. Ed. 961.)

It therefore follows that, when in 1930 the Virginia Legislature, pursuant to its reserved power, as contained in Sections 154 and 158 of the Constitution of Virginia and Sections 3841 and 3852 of the Virginia Code, enacted Section 3820a providing for the sale of corporate assets and when it amended the same in 1936 and also, when in 1903 it enacted the statute providing for the merger and consolidation of corporations and subsequently passed the amendments thereto, now Section 3822 of Michie's Code of 1936, and by said Section 3820a integrated the procedure provided by Section 3822 for the establishment of the fair cash value of the stock of a dissenting stockholder, it was well within the limits of constitutional competence.

Let us turn aside for the moment and consider the meaning of the word "liquidation" as it appears in the preferred stock certificates and in the amendments to the charter, which have been heretofore quoted. The appellees lean strongly upon the defense that the plan, which we have been considering and which was adopted in the reorganization of the old company resulting in the new company was really and in fact a liquidation of the assets of the old company, and this contention was sustained by the trial court. The scheme or plan and its incidents do not sustain this position.

In Words and Phrases, Perm. Ed., vol. 25, pp. 368, 371, we find the following:

"Mr. Justice Story said in *Fleckner* v. *Bank of United States*, 21 U. S. (338), 8 Wheat. 338, 362, 5 L. Ed. 631: 'The ordinary sense of liquidation, as given by lexicographers, is to clear away—to lessen—a debt; and in common parlance, especially among merchants, to liquidate the balance is to pay it.' *Richmond* v. *Irons*, 121 U. S. 27, 7 S. Ct. 788, 804, 30 L. Ed. 864.

" 'In its general sense, liquidation means the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss.' 3 Cent. Dict. 3474. The word was so used in a resolution of the directors

of an insurance company to reinsure its risks and to liquidate its affairs. *L. D. Garrett Co.* v. *Morton,* 35 Misc. 10, 71 N. Y. S. 17, 19."

" * * * Liquidation is the act of settling or adjusting debts, or ascertaining their amount, or the balance due." Am. & Eng. Ency. of Law, Second Ed., Vol. 19, page 391.

The plan submitted by the board of directors, measured by the above definitions, dissipates the notion of the presence of liquidation. It was not concerned with the debts of the old corporation, as to a statement of them for the purpose of paying any balance ascertained. It was not an operation of winding up the affairs of the old company by getting in its assets and settling with its debtors and creditors, nor did the element of "profit or loss" enter into it. In our opinion it involved an entirely different and exceedingly important doctrine associated and connected with corporations, which is that of Reorganization.

"In Corpus Juris Secundum, vol. 19, Corporations, p. 1318, Section 1578, an entire section (that referred to) is devoted to the subject "Reorganization". This is said: "Reorganization of a corporation is the reconstruction or rehabilitation of an existing corporation. It is frequently regulated by statute, the right to reorganize being derived from the laws of the state of the corporation's origin.

"Reorganization, in the law of corporations, has been defined to mean that by some process a corporation has organized anew, usually effected by the dissolution of one and the organization of a new corporation to take the property and franchise of the first and to continue its business. * * * It has been held that where a new corporation is formed by stockholders and directors of an existing corporation, and its directors and practically all its stockholders, franchises, and property are identical with those of the old corporation, the transaction both in fact and in law amounts to a reorganization of the old corporation."

Idem. "While courts will not formulate plans of reorganization and compel the persons affected thereby to accept them against their will, yet courts in general are

favorable to reorganizations which are fair and free from fraud."

By the plan which was adopted the new corporation, i. e. the Craddock-Terry Shoe Corporation, was formed by stockholders and directors of the old corporation, i. e. Craddock-Terry Company. The stockholders and directors of the new corporation and its property (except its franchise) are identical with those of the old corporation, with the exception of the dissident stockholders of the old company. Their objects, purposes and business were identical with the exception of the fact that the new corporation entered the business world with a capital structure unimpaired and in inviting form for credit and confidence. This was accomplished by the single stroke of reducing the par value of $100 for the existing common stock to new common of no par value, but which is carried on the books of the new corporation at $1 per share. This advantageous condition is in contrast to that of the old company which was burdened with a capital impairment of approximately two million dollars. The new set-up should have presented a consummation devoutly to be wished.

That the transfer of the assets in the immediate case by the vendor corporation and the receipt of stock of the vendee corporation in payment thereof is not an act of liquidation will be seen by the following authorities.

*Buck* v. *Kleiber Motor Co.*, 98 F. (2d) 903:

"Petitioner claims that the transfer of assets from the Truck Company to the Motor Company in 1926, constituted a liquidation of the Truck Company within the meaning of the provision of its articles of incorporation reading: ' * * * (In) case of liquidation or dissolution of the Company, (the preferred stockholders) shall be paid in full at the par value of their said shares and the accrued dividends, before any amounts shall be paid to the holders of the common stock'."

\* \* \* \* \* \*

"We do not regard a transfer of all the assets upon the consideration of an issue of stock by the transferee to the

transferor, the latter to become a holding company, as a liquidation of the latter company's assets. The fact that the stock in fact never was acquired by the transferor of the assets and part was accepted by some of the stockholders of the transferor corporation does not change the transaction into a liquidation within the meaning of the latter's corporate articles."

In the case of *In re Fulton*, 257 N. Y. 487, 178 N. E. 766, 79 A. L. R. 608, in which the Corporate Sales Statute of New York, very similar to the Virginia Statute, which provided for the appraisal of the stock held by a dissenting, preferred stockholder, this was said:

"We do not pass upon the question of the proper rule to be applied upon the distribution of surplus between common and preferred stock upon the dissolution of a corporation. The determination of that question is not involved in this case."

&ast; &ast; &ast; &ast; &ast; &ast;

"This proceeding has no resemblance to an action or proceeding to dissolve a corporation. It is a purely statutory proceeding. The statute expressly provides for the fixing of the value of the stock of a going concern, as of the time of the dissent."

&ast; &ast; &ast; &ast; &ast; &ast;

"While the sale of the assets of a corporation changes the character of the business of the vendor corporation, and establishes the right of a dissenting stockholder to have his stock appraised, it does not amount to an actual dissolution."

The case of *Federal United Corp.* v. *Havender* (Del.), 11 A. (2d) 331, presents a comprehensive and logical treatment of the important questions here, though it was concerned with a merger.

The sixty-six page brief of the learned attorney *amicus curiae* gives it scant consideration and seems to find much from the fact that the Harvard Law Review in volume 53, page 877, commented upon it with disapproval. He perceives that there is a basic distinction between a sale of

assets and a merger which satisfies his estimate of the significance of the case.

Here is what is said in part by the eminent Chief Justice of the Delaware court, in speaking of the elements of the merger and consolidation provisions of the Delaware General Corporation Law, which I submit is consonant with the view I am endeavoring to express and is apposite:

"It is elementary that these provisions are written into every corporate charter. The shareholder has notice that the corporation whose shares he has acquired may be merged with another corporation if the required majority of the shareholders agree. He is informed that the merger agreement may prescribe the terms and conditions of the merger, the mode of carrying it into effect, and the manner of converting the shares of the constituent corporations into the shares of the resulting corporation. A well understood meaning of the word "convert", is to alter in form, substance or quality. Substantial rights of shareholders, as is well known, may include rights in respect of voting, options, preferences and dividends. The average intelligent mind must be held to know that dividends may accumulate on preferred stock and that in the event of a merger of the corporation issuing the stock with another corporation, the various rights of shareholders, including the right to dividends on preference stock accrued but unpaid, may, and perhaps must, be the subject of reconcilement and adjustment; for, in many cases, it would be impracticable to effect a merger if the rights attached to the shares could not be dealt with. The state has an interest in the corporate structures erected under its authority. Having provided for the merger of corporations, they are not regarded with disfavor. On the contrary, mergers are encouraged to the extent that they tend to conserve and promote corporate interests. The catholic quality of the language of the merger provisions of the law negatives a narrow or technical construction if the purpose for which they were enacted is to be accomplished. *MacFarlane et al.* v. *North American Cement Corporation*, 16 Del. Ch. 172, 157 A. 396. Moreover,

it is recognized that there may be shareholders who will be dissatisfied with the effects of the terms of the merger proposal upon the rights attached to their shares. While their right to dissent is admitted, the public policy of the state declared by the statute, somewhat analogous to the right of eminent domain, does not permit a dissenting shareholder, as against an affirmative vote of two thirds, to veto a merger agreement if its terms are fair and equitable in the circumstances of the case. Within the time and in the manner provided by the statute, the dissatisfied stockholder, if he so desires, may demand and receive the money value of his shares as that value has been agreed upon or has been determined by an impartial appraisement. Consequently, in a case where a merger of corporations is permitted by the law and is accomplished in accordance with the law, the holder of cumulative preference stock as to which dividends have accumulated may not insist that his right to the dividends is a fixed contractual right in the nature of a debt, in that sense vested and, therefore, secure against attack. Looking to the law which is a part of the corporate charter, and, therefore, a part of the shareholder's contract, he has not been deceived nor lulled into the belief that the right to such dividends is firm and stable. On the contrary, his contract has informed him that the right is defeasible; and with that knowledge the stock was acquired."

See also *Hottenstein* v. *York Ice Machinery Corp.*, 45 F. Supp. 436, in which the injured preferred stockholders lamented that the merger was not bona fide and "is a sham, subterfuge, and device employed as a vehicle to deprive the Preferred Stockholders of their preferential rights and accumulated dividends." The court, however, took a different view of the matter following the Havender case to which we have pointed.

See also *Hubbard* v. *Jones, etc., Steel Corp.*, 42 F. Supp. 432.

As I see it a complete refutation of the soundness of the attitude of the majority is found in the provisions of the applicable statutes of Virginia, which it chooses to ignore.

This fact differentiates this case from most of those cited in the majority opinion and makes them inept beyond their philosophy.

The two statutes, sections of the Virginia Code (Michie), 3820a and 3822 unite in suitable agreement to form a perfectly blended scheme to accomplish the ends intended by the legislature.

The decision strikes down and frustrates a wholesome statutory purpose.

I cannot refrain from noting that the eminent attorney, *amicus curiae*, stresses his point that the directors of the retiring corporation here must be seen and viewed in their fiduciary relation as trustees of the corporate interests and matters. I cannot conceive of a more impelling obligation upon such relationship than a strict observance of the provisions of the governing statutes. Nor is there a safer guide.

The appelles urge with insistency that the sale of the corporate assets and the distribution of the proceeds of the sale are separate and distinct matters and that the statutes invoked do not provide for distribution and that there is the incident which overthrows the position of the appellants.

This contention is amply answered by its treatment in the brief of eminent counsel for the appellants:

"Even were this a correct assumption, it would not affect the result. But a careful reading of the statute shows the patent error of this conclusion. The subject matter of the statute is the sale of the whole of the corporate property and assets. It provides that a dissenting stockholder upon giving the prescribed written notice, shall, upon the ascertainment thereof, be paid by the vendor corporation the fair cash value of his stock. If this fair cash value, so paid by the vendor corporation, which has sold and transferred the whole of its property and assets, is not a distribution of the proceeds of the sale, by what legerdemain has the fund been brought into existence?

"The answer is found in the plan outlined in the letter to the stockholders, dated August 1, 1938 (Rec., p. 130), whereby the vendee corporation bound itself as a part of

the consideration to pay the vendor such sums as equals the amounts the vendor might be required to pay its dissenting stockholders, pursuant to the Virginia statutes. As to the dissenting stockholders, Section 3820a provides that the vendee corporation may acquire the whole of the property and assets of the vendor upon such terms and conditions and for such consideration, either payable in cash, stock or securities of another corporation as the board of directors, in their discretion, may determine. It might be observed that a dissenting stockholder, being entitled to payment in cash, would not be concerned with his fellow stockholders who had approved the sale and elected to be bound thereby. In any event, upon their concurrence in the sale, the question is one between the assenting stockholder and his corporation, without interference from a dissentient who has elected to be paid cash from the proceeds of sale.

"As was said in *Feld* v. *Roanoke Investment Co.* (Mo.), 27 S. W. 637:

" 'There can be no question but that the Fair Company (vendor) had the right to take stock in the Roanoke Company (vendee) for those of its stockholders who were willing to take it in lieu of money.' "

GREGORY, J., dissenting.

The majority concede the validity of Code, section 3820a, which by express language incorporates section 3822, but refuse to apply its provisions. It is not denied that 3820a is binding on Craddock-Terry Company and on all classes of its stockholders. Under Section 158 of the Constitution of 1902, the Craddock-Terry Company, having accepted amendments to its charter from time to time, is conclusively considered to have agreed to hold its charter and franchise subject to all the terms and conditions of the Constitution and of any laws passed in pursuance thereof, so far as same may be applicable.

At common law, in Virginia, it was thought that a corporation could not sell all of its assets without the unanimous consent of the stockholders. This brought about the enactment of 3820a, which provides a comprehensive plan for the sale of all assets of a corporation. Under Code, section 3841, applicable statutes are a part of every charter and a part of the contract of every stockholder. Code, section 3852, carries into effect that part of Section 158 of the Constitution which makes all charters of corporations subject to the laws of the State if those corporations have accepted amendments to their charters as is the case here. The inevitable result is clearly stated in the brief of appellees filed on re-hearing:

"The result is therefore inevitable that, in consequence of those constitutional and statutory provisions, after the amendments by the Corporation Commission of the charter of the corporation, even though said charter had been granted prior to the effective date of the present Constitution, the corporation became subject to the Constitution and general laws of the State passed in pursuance thereof, so far as applicable, and that this result is not limited to the relation between the State and the corporation, but applies also to the relations between the State and the stockholders, between the corporation and its stockholders and between the stockholders themselves. It further follows that this reservation of the power to amend, alter or repeal the charters of corporations, whether written in the Constitution, in general laws, or in the charter itself, qualifies the grant, and the subsequent exercise of that power cannot be regarded as an act impairing the obligations of the contract."

It having been conceded that Sections 3820a and 3822 are valid, our only inquiry should be whether they have been followed. It must be admitted that they have been followed to the letter. It so appears from the record.

The dissenting stockholders' rights must be appraised not only by those rights which were expressed in the charter and in their certificates but also in the light of those qualifications which are expressed in the applicable constitutional

and statutory provisions. They knew of the provisions of 3820a and 3822 and that they were a part of their contract. They knew that a sale under 3820a would result in their getting the fair cash value for their stock (unless they consented) to be computed under the elaborate provisions of Section 3822.

The majority say that no distribution of the proceeds of sale is provided for in Section 3820a, therefore the new stock must be held by the old company and that it must not be distributed except in accordance with the sole provisions of the old charter and old certificates. Section 3822 is a part of 3820a and it provides for distribution to dissenting stockholders in express terms. They are to be paid the fair cash value for their stock. No clearer provision for distribution could have been written into the statute. Distribution here is of two kinds:. first, that which has been agreed to by the consenting stockholders which is not important here, and, second: that which is expressly provided for the dissenting stockholders. Distribution as to the latter is only of importance here and it has been expressly provided for in plain statutory language. Of course, if we are to ignore the applicable statutes, the sale would have to take place only according to the rule at common law; that is, by consent of 100% of the stockholders. In effect that result is accomplished by the opinion of the majority.

If that be true the legislature has done a vain thing. It has enacted a statute for the express purpose of eliminating the common law rule, but in their eagerness to prevent a fancied wrong the majority refuse to abide by the statute.

I use the phrase "fancied wrong" because, in fact, the dissenters are deprived of no right or property by the sale. They get exactly what their contents call for: to wit, the value of their stock which they hold subject to their rights under the charter and under the applicable statutes. Obviously, the conclusion of the majority is reached by reason of its absolute refusal to recognize that the dissenting stockholders' rights are affected by the statute.